T PEKA COMMERCIAL SECURITY COMPANY *et al.* v. J. B.
McPHERSON *et al.*

(Filed July 30, 1898.)

1. TOWN SITE LOTS—*Taxation.* The legislature of this Territory has no
authority to subject to taxation lots in a government town site pend-
ing the determination of a contest in the land department between
occupying claimants therefor, or until a rightful claimant has ac-
quired a right, under the town site laws, and the regulations of the
interior department concerning the disposal of lots therein, to a
deed therefor. Any proceedings to subject such lots to taxation,
or to convey the same for nonpayment of taxes, are void; being in
violation of section 6 of the Organic Act of the Territory, prohibit-
ing the legislature from interfering with the primary disposal of the
soil.

2. SAME—*Improvements on Taxable.*    By paragraph 15, art. 1, ch. 70,
Statutes Oklahoma 1893, the legislature did not attempt or intend
to subject to taxation undeeded town site lots in government town
sites pending contests in the land department between claimants
for such lots, but did intend, and had rightful authority, to subject
all improvements thereon to taxation.
(Syllabus by the Court.)

*Error from the District Court of Oklahoma County; before
J. R. Keaton, District Judge.*

*J. Milton,* for plaintiff in error, Topeka Commercial
Security Co.; *W. R. Taylor, County Attorney,* for Board of
County Commissioners.

*H. H. Howard, T. J. Chambers* and *Selwyn Douglas,* for
defendants in error.

Opinion of the court by

TARSNEY, J.:   The question in this case is directly this:
Are lots in a government town site in this Territory sub-
ject to sale for taxes levied and assessed against said
lots while contests are pending in the land office between

occupying claimants, and before deed issued by the town site trustees? This involves two questions: First, has the legislature of the Territory attempted to make such undeeded lots, pending contest, subject to taxation? and, second, has the legislature the power to authorize such taxation? Considering these questions in their order, we find that the only attempted exercise by the legislature of the taxing power, so far as it relates to the designation of property made subject to taxation, is contained in chapter 70 of the General Statutes of 1893, and the only provisions of said chapter which can possibly be construed as showing an intent on the part of the legislature to tax the lots in controversy are contained in section 3, art. 1, of said chapter, and are as follows:

"Sec. 3. All other property, real and personal, shall be subject to taxation in the manner provided in this act: First. Lands and lots in towns and villages and cities, including lands bought from or donated by the United States and from the Territory, and whether bought on credit or otherwise. * * Third. Lands or lots shall be assessed to the owner thereof at their actual cash value on the first day of January of each year, and the owner on that day shall be liable for the tax of that year. * * Fifteenth. All other property, real and personal, of any kind not including improvements upon government lands, or lots not deeded."

The language of the first and third paragraphs quoted leaves no doubt that the legislature intended to refer therein to only such lands and town lots in villages and cities for which there was an owner holding title by deed of conveyance. It is also apparent that the fifteenth paragraph above quoted is the only one from which a legislative intent to authorize the taxation of undeeded lots in government town sites can be claimed or inferred.

Does this paragraph show a legislative intent to subject such lots to taxation?

In *Territory v. Clark*, 2 Okla. 82, 35 Pac. 882, it was held that the legislature intended that all improvements upon government lands should be subject to taxation, except those especially exempted. The effect of that decision was to eliminate the word "not" from before the words "including improvements" in said paragraph, and to make said paragraph read, "All other property, real and personal, of any kind including improvements upon government lands, or lots not deeded." Giving to this paragraph, as thus quoted, a natural interpretation, it would indicate the intention of the legislature to have been to subject to taxation such improvements as might be on government lands, or lots not deeded, and not to subject the lands or lots themselves to taxation. To give this paragraph a construction indicating a purpose of the legislature to subject town lots not deeded to taxation, we must change the grammatical structure of the paragraph by striking out the word "or" before the word "lots," and insert in lieu thereof the word "and," and substitute a semi-colon in lieu of the comma after the word "lands."

It is our opinion that the legislature never assumed to be vested with power to subject these lots to taxation, and never attempted to exercise such power; that the furthest purpose of the legislature, as implied from the the language of the enactment, was that improvements placed upon government lands, or placed upon town lots, the title of which had never passed by deed, should be subject to taxation, but not the lands or lots themselves.

But conceding that it was the purpose of the legislature to subject these lots to taxation, and to sale therefor,

we are not willing to concede that any such power existed in the legislature. Prior to April 22, 1889, all the lands embraced within the boundaries of what is now the Territory of Oklahoma were a part of the public domain of the United States, or belonged to Indian tribes, and the title to all of said lands was in the United States. By an act of congress approved March 2, 1892, and the president's proclamation issued thereunder, all of said lands, except those belonging to Indian tribes, were on the 22d day of April, 1889, opened for homestead settlement, except that the secretary of the interior was authorized to re-serve certain portions thereof for townsite purposes.

The act of congress of May 2, 1890, establishing a territorial government for the Territory of Oklahoma. defined and limited the scope of legislative authority of such territorial government, in section 6 of said act, as follows:    "The legislative power of the Territory shall extend to all rightful subjects of legislation not incon-sistent with the constitution and laws of the United States, but no law shall be passed interfering with the primary disposal of the soil; no tax shall be imposed on the property of the United States." No provision was made for the disposal by the United States of the lands authorized to be reserved for town site purposes, or for the conveyance of the title of the United States in any lots in any town site to individuals, nor any pro-vision made for determining who might  acquire title to such lots, until May 14, 1890, when by an act of con-gress of that date provision was made therefor. By sec-tion 1 of said act it was provided "that so much of the public lands situate in the Territory of Oklahoma, now open to settlement, as may be necessary to embrace all the legal subdivisions covered by actual occupancy for

purposes of trade and business, not exceeding 1,280 acres in each case, may be entered as town sites, for the several use and benefit of the occupants thereof, by three trustees appointed by the secretary of the interior for that purpose, such entry to be made under the provisions of Sec. 2387 of the Revised Statutes as near as may be; and when such entry shall have been made, the secretary of the interior shall provide regulations for the proper execution of the trust, by such trustees, including the survey of the land into streets, alleys, squares, blocks, and lots when necessary, or the approval of such survey as may already have been made by the inhabitants thereof, the assessment upon the lots of such sum as may be necessary to pay for the lands embraced in such town site, costs of survey, conveyance of lots and other necessary expenses including compensation of trustees." By other provisions of said act it was provided that when application for entries of town sites should have been allowed by the interior department, and when final entry was made, the title of the United States to the land covered by such entry should be conveyed to said trustees by the secretary of the interior for the uses and purposes in said act provided; that the trustees under said act should have power to administer oaths, to hear and determine all controversies arising in the execution of their trusts, and keep a record of their proceedings.

In *Knight v. Association*, 142 U. S. 161, 12 Sup. Ct. 258, it was declared that the secretary of the interior was clothed with plenary authority, as the supervising agent of the government, in all matters relating to sale and disposition of the public land, the surveying of private land claims, the issuing of patents thereon, and the administration of the trusts devolving upon the government by

reason of the laws of congress respecting the public do-
main, to do justice to all claimants, and to preserve the
rights of the people of the United States, and that he
could exercise such supervision by direct orders, or by
review on appeal, and, in the absence of statutory direc-
tion, prescribe the mode in which it could be exercised,
by such rules and regulations as he might adopt.    In the
execution of the trust created by the act of May 14, 1890,
the secretary of the interior, on June 18, 1890, issued a
circular setting forth such regulations. (19 Land Dec. Dep.
Int. 666.)    Paragraph 12 of such regulations provided for
the hearing and determination by the town site trustees
of controversies between two or more claimants to the
same lot, block, or parcel of land; and in paragraph 13,
for an appeal from their judgment to the commissioner
of the general land office, and an appeal from the commis-
sioner to the secretary.

In *McDaid v. Oklahoma*, 150 U. S. 209, 14 Sup. Ct. 59,
the supreme court of the United States, construing the act
of May 14, 1890, and the regulations promulgated by the
secretary thereunder, says:

"In the light of these provisions we perceive no reason
for doubting that the trustees appointed by the secretary
under the act, and whose compensation and expenses were
fixed by him, were agents of the government for the pur-
pose of carrying out the trust thereby created, to the
extent and as specified; and this included the ascertain-
ment of the beneficiaries in the first instance, and the
transfer of the title to them.    While on the final entry
the title of the United States was to be conveyed to the
trustees such conveyance was explicitly declared as made
'for the uses and purposes in the act provided'; and
among these uses and purposes was the determination of
controversies between contesting claimants by the trus-
tees, who were to administer oaths, pass on evidence,
—22

and keep a record of their proceedings, to be deposited in the land department.    They unquestionably acted in that regard as the representatives of the government, and their decisions were properly subject to that appeal to the commissioner and the secretary for which the secretary's regulations provided.    As matter of convenience, the trustees were the instrumentality for the transmission of title in respect of lands disposed of to actual holders.    *    * By the scheme of this act the title is held in trust for the occupying claimant, it is true, but also in trust, *sub modo,* for the government, until the rightful claimants and the undisposed of or surplus lands are ascertained."

In our view, this case is absolutely decisive of the proposition involved in the case at bar.    If the title to these lots was yet in the government of the United States, or in its agents, as trustees, for the purpose of carrying out a trust, at the time that the taxes in controversy were assessed and levied thereon, and if a sale under such tax proceedings could be made the basis for conveying the title to such lot to a purchaser at such sale, not the rightful claimant to such lot, and before the trustees of the government, in the exercise of the powers of their trust, or the secretary, in the exercise of his supervisory powers over the trustees, had ascertained who was the rightful claimant, then such conveyance would be "interfering with the primary disposal of the soil," and would be the enforcement of taxation "imposed upon the property of the United States."    What is meant by "primary disposal of the soil?"    In view of the previous legislation upon the subject, there can be no doubt as to what was the intent of congress in inserting the limitation upon the general legislative power of the Territory in the sixth section of the Organic Act, that prohibits "interfering with the primary disposal of the soil."    By the act of

March 2, 1889, congress had dedicated all the lands of
the United States in Oklahoma to the purposes of home-
stead settlement, except such as might be withheld from
such settlement for town site purposes, and in the act
of May, 14, 1890, had dedicated such reserved lands for
transmission to those who might be rightfully claim-
ants of the lots or parcels into which such lands might be
divided; and congress, by the limitation of the power of
the legislature contained in the sixth section of the Orga-
nic Act, clearly intended to prevent the territorial legis-
lature from in any manner interfering with the govern-
ment or its agents or trustees in  transmitting the title
of such lands to the rightful claimants, either as home-
steaders or as occupiers of such town lots.  Congress
clearly foresaw that there would be contesting claim-
ants for these lands.  It had specially disqualified certain
classes of persons from acquiring title to any of these
lands or lots.  It had in view the fact that these dis-
qualified persons would be claimants for such lands and
lots, and it had therefore reserved to the officers and
agents of the United States all authority to determine
who were rightful claimants, and to whom conveyance
should be made.

And in the McDaid case it is said: "Until the trustees
conveyed, the title did not pass beyond the control of the
executive department."  If the  title  did  not  pass
beyond  the  control  of  the  executive  department
until the trustees should convey to a rightful claimant,
then any procedure under territorial legislative authority
which would have the effect of conveying such lots to
persons other than the rightful claimants would have
the effect of depriving the executive department of the
power of conveying to said rightful claimants, and would

thus interfere with the officers and agents of the government in the primary disposal of these lands.

The contention that the "primary disposal of the soil" is embraced in and covered by the patent to the town site trustees merits no serious consideration. The government has not disposed of the lands when it issues a patent to the trustees. It has simply conveyed the naked legal title for the purposes of the trust. It is simply a warrant of attorney to the trustees to convey for the government that which is still the property of the United States, to such persons as are rightfully claimants to such lots, when, and not until, the rightfulness of the claims of such persons shall have been judicially determined by the trustees and the officers of the land department. If the trust fails for want of a beneficiary rightfully making claim thereto, then the power of the trustees ceases; the naked legal estate no longer exists in the trustees; the title of the land remains in the United States, to be disposed of by the secretary of the interior for the other uses specified in the act.

In our view, the "primary disposal" of the lands of the United States means their disposal by the officers or agents of the government to some person who, having the qualifications to acquire such lands, and who has complied with the terms of the law therefor, is entitled to conveyance thereof by patent or deed, without any reserved authority in the government or its officers to withhold the same. In section 4 of the town site act of May 14, 1890, it is provided that "all lots not disposed of as hereinbefore provided for, shall be sold under the direction of the secretary of the interior, for the benefit of the municipal government of any such town; or the same or any part thereof, may be reserved for public use

as sites for public buildings, or for the purposes of parks, if, in the judgment of the secretary, such reservation would be for the public interest, and the secretary shall execute proper conveyances to carry out the provisions of this section."

Let us assume that two persons were occupying claimants of one of these lots when the patent was issued to the town site trustees; that each contested the claim of the other for a deed to such lot on the ground of disqualification to acquire such lot; that pending such contest in the land office the lot was assessed to one of these claimants, and sold to a third person under tax proceedings; that subsequent to such sale the land department decided that neither of the claimants were rightful claimants, because of their disqualifications. In such case, under section 4 of the town site act above quoted, it would be the duty of the secretary to sell said lot for the benefit of the town, or reserve the same for a park or a site for a public building. If the tax proceeding could be held to be valid to convey the title of the lot, would not the effect be to deprive the secretary of the power of disposing of the lot in the manner that congress has expressly declared for its disposal, where there is no rightful occupying claimant? And does this not demonstrate that such tax proceedings would be a direct interference with the primary disposal of the lot by the government?

In *Railroad Co. v. Prescott*, 16 Wall. 603, is was held that lands which had constituted a part of the public domain might be taxed by the state before the government has parted with the legal title by issuing a patent, but that this could only be done when the right to the patent was complete, and the equitable title vested in

the party, without anything more to be paid, or any act to be done, going to the foundation of his right, and that, where the government had a right to retain the patent until the cost of surveying the land had been paid, such lands were not subject to taxation by the state until such costs of survey had been paid.

And in *Railroad Co. v. McShane*, 22 Wall. 444, it is said: "If such a sale could be made, it must be valid, if the land is subject to taxation, and the title would pass to the purchaser. If no such title could pass, then it is because the land is not liable to the tax, and the treasurers of the counties have no right to assess it for that purpose. But, when the United States parts with her title, she has parted with the only means which that section of the statute gives for the payment of these costs. It is by retaining the title that the payment of costs of survey is to be enforced." In that case the court had under consideration the act of July 2, 1864, creating the Union Pacific railroad, the twenty-first section of which provided "that before any land granted by this act shall be conveyed to the said company or party entitled thereto, there shall first be paid into the treasury of the United States the costs of surveying, selecting and conveying the same by the said company or party in interest, as the title shall be required by said company." It appeared in that case that the lands had been mortgaged by the company under sanction of the act of congress, and it was contended that the mortgage conveyed the legal title out of the United States, so that her right could no longer be interposed to protect them from taxation; but the court said: "It is not necessary to go into the merely technical question whether the legal title passed from the United States by virtue of that mort-

gage and the act of congress which authorized it, nor whether, if it ever becomes necessary to foreclose that mortgage, the rights of the United States in the land would be divested by the proceeding, because we are satisfied that the United States, until she conveys them by patent or otherwise, has an interest, whether it be legal or equitable, which the state of Nebraska is not at liberty to divest by the exercise of the right of taxation." The doctrine of these cases, as we interpret them, is that, where something remains to be done before a party seeking to acquire title from the government to a part of the public domain is entitled to a conveyance of such title, the United States has such an interest in the land, whether it be legal or equitable, as cannot be divested by the state in the exercise of the right of taxation. Applying the principle of these cases to the case at bar, they leave no ground for the upholding of the taxation here sought to be enforced. At the time the tax deed in question was executed, the land department had not yet determined, under its power to determine, that there was any claimant who was a rightful claimant for said lots. The land department had not yet adjudicated whether the lots should be conveyed to an occupying claimant, or whether they should be sold by the secretary for the benefit of the town, or dedicated by him for the uses of a park or a site for a public building; but, even though there was a rightful occupying claimant of said lots, the assessments that would be lawfully made to pay for the lands embraced in such town site, the costs of survey, conveyance of lots, and other necessary expenses, including the compensation of the trustees, would have to be paid by such claimant before he would be entitled to a conveyance, and the United States would, by its agents and trustees,

retain the legal title by withholding the deed of convey-
ance for the purpose of securing the payment of these
expenses; and, in the language of *Railroad Co. v. Mc-
Shane,* "It cannot be permitted to the states [territory]
to defeat or embarrass this right by a sale of the land for
taxes."

It would serve no useful purpose to enter into an
analysis of each of the numerous cases cited and relied
upon by the learned judge who wrote the former opinion
in this case, in order to show the inapplicability of the
doctrine of those cases to the case at bar. The vice of
the former conclusion in this case is found in the predi-
cate upon which it was based. In the opinion it is said:
"But it is contended that inasmuch as the supreme court
of the United States held in theMcDaid case that, while
the title of the town site is conveyed by the government
to the trustees for the occupying claimants, as the super-
visory control of the lands is still in the government, to
be exercised through the trustees, who are government
officers, the property of the occupant in a town lot can-
not be taxed. This contention is untenable, for the rea-
son that it is the property of the occupant in the town
lot, and not the title, which is taxed. The private prop-
erty of the citizen may be taxed, even though the legal
title to the land out of which he derives his property, or
upon which his property may be located, is in the gov-
ernment. The question is not, what is his title? but,
what is his property? and, may that property be made the
subject of taxation?" This predicate fails to appreciate
the distinction between a reveune system, the proceed-
ings under which are in the nature of proceedings *in
rem,*and a system under which the proceedings are in the
nature of proceedings *in personam,* with a lien cr right

of recovery against the interest of the owner in the property taxed. No one will deny that under the legislative power of this Territory any possessory right or any estate or interest of any person in lands might be made subject to taxation, as well as the lands themselves. It would not be disputed that a mere leasehold interest could be subjected to taxation, and such interest sold in satisfaction of the tax, but such proceedings would not convey the land. In this case it is not a question of what the legislature might have done, or what interest of the claimant in undeeded town site lots they might have made subject to taxation. The question is, what have they sought to tax? A mere possessory right, limited estate or interest, or the lots themselves? If by the fifteenth paragraph of article 1 of our revenue law, which we have quoted, the purpose of the legislature was not limited to the taxing of the improvements upon undeeded lots, but its purpose was to subject to taxation the lots themselves, there is nothing in the language of that paragraph to indicate a purpose to tax any limited estate, right of possession, or mere claim thereto.

The cases of *State v. Moore,* 12 Cal. 56; *People v. Shearer,* 30 Cal. 635; *Hale & N. Gold & Silver Co. v. Storey Co.,* 1 Nev. 104; *Wright v. Cradlebaugh,* 3 Nev. 341; *People v. Black Diamond Coal Co.,* 37 Cal. 54; and *Forbes v. Gracey,* 94 U. S. 762—do not support the former conclusion in this case, but, on the contrary, support an opposite conclusion. They are all cases arising under laws subjecting to taxation what are known as "mining claims," under which the owner has no title to the soil, but has simply a right of possession and to take mineral therefrom. It was held in all those cases, and rightly held, that the state had a right to subject such property to taxation,

and to sell under tax proceedings the possessory right of the owners of such mining claims, and that such proceedings and sale were not void because the title of the lands was in the United States, for the reason that such sale did not purport or attempt to convey the land, or any title thereto, but only a possessory right.

We concede and hold that the legislature of this Territory may provide for the taxation of improvements on undeeded lots in town sites, or for the taxation of any posessory right thereto; but we must hold that the legislature has no authority to subject to taxation the lots themselves, or to authorize their conveyance under tax proceedings, until they shall have been deeded to a rightful claimant therefor; and we hold, further, that by the provisions of our revenue law herein quoted the legislature did not attempt or intend to subject such lots to taxation, but only intended to subject the improvements thereon thereto. For the reasons herein stated the former opinion and conclusion in this case is not approved, and it is ordered that the judgment of the court below be affirmed.

All of the Justices concurring.