[Civil No. 1720.   Filed December 16, 1919.]

[185 Pac. 934.]

THE STATE OF ARIZONA, at the Relation and to the Use of IGNATIUS BURGOON, Treasurer and Ex-officio Tax Collector of the County of Santa Cruz, State of Arizona, Appellees and Appellants, v. CORNELIUS C. WATTS, and His Wife, JANE DOE WATTS, DABNEY C. T. DAVIS , Jr., and His Wife, JANE DOE DAVIS, Jr., JAMES E. BOULDIN and His Wife, JENNIE N. BOULDIN, HELEN LEE BOULDIN, and WELDON M. BAILEY, and His Wife, JANE DOE BAILEY, Appellees and Appellants.

1. TAXATION—RIGHT TO PUBLIC LAND SELECTED IS A "CLAIM TO LAND" AND TAXABLE.—Defendants, successors in interest of Baca heirs as to one of the tracts selected by said heirs by their attorney pursuant to Act Congress June 21, 1860, section 6, *held* to have "a claim

1. Liability to state taxation of United States property granted or sold by government, but to which government still holds legal title, note, 11 Ann. Cas. 391.

to land" which was taxable under Civil Code of 1913, paragraph 4847, for the years 1913 and 1914, though notes and plats of survey made in 1905 of tracts selected were not filed until December 14, 1914, pursuant to decision of the United States Supreme Court because title had been the subject of constant litigation in the courts or before the Land Department.

2. TAXATION—LAND SUFFICIENTLY IDENTIFIED FOR PURPOSES OF TAXATION.—A tract of land selected for Baca heirs pursuant to Act of Congress June 21, 1860, section 6, *held* sufficiently identified for the purpose of taxing claim of defendants (successors of Baca heirs) thereto, though notes and plats of survey of the tracts selected for said heirs had not been filed.

3. TAXATION—ASSESSMENT AGAINST UNKNOWN OWNERS COMPLIANCE WITH STATUTE.—The addition, to assessment-roll assessing entire tract to "unknown owners," of names of various claimants to tract with apparent attempt to describe the several portions claimed by the parties, *held* to amount to only an assessment against unknown owners, and to be a sufficient compliance with Civil Code of 1913, paragraph 4860.

4. TAXATION—PROPERTY IN LITIGATION MAY BE ASSESSED TO UNKNOWN OWNERS.—Where title to property is in litigation and assessor has no means of determining what may be the ultimate result of the litigation, he may assess the property to unknown owners.

CROSS–APPEALS from a judgment of the Superior Court of the County of Santa Cruz. Samuel L. Pattee, Judge. Judgment affirmed in part and reversed in part, with instructions.

Mr. Wiley E. Jones, Attorney General, Mr. C. M. Gandy, Mr. L. B. Whitney, Mr. A. B. Baker, and Mr. F. J. K. McBride, Assistant Attorneys General, and Mr. Leslie C. Hardy, County Attorney, for the State.

Messrs. Kingan & Campbell, for Cornelius C. Watts and Others.

BAKER, J.—This action was commenced in the lower court to enforce the tax lien of the state for delinquent taxes for the years 1913, 1914, 1915 and 1916, upon a tract of land situated in Santa Cruz county, known as "Baca Float No. 3." The trial court delivered a memorandum opinion, wherein it

held that the lands in no event were taxable for the years 1913 and 1914, because a survey thereof had not been filed with the Commissioner of the General Land Office until a time after the making of the taxes for each of those years, in consequence of which the lands did not become segregated from the public domain so as to render them susceptible of taxation by the taxing authorities of the state of Arizona and the county of Santa Cruz. The trial court, however, held that the lands were taxable for the years 1915 and 1916, notwithstanding the objections which were raised as to the alleged irregularity in making the tax for those years, and accordingly rendered judgment for the state as to the taxes for the years 1915 and 1916. There are cross-appeals. The state appeals from that portion of the judgment which adjudged that the taxes were invalid for the years 1913 and 1914, and the defendants appeal from that portion of the judgment which adjudged that the taxes were valid for the years 1915 and 1916. We shall consider first the appeal of the state.

The historical facts of the grant (Baca Float No. 3) are interesting to follow. These facts are undisputed, and we have gathered them from various sources:

On January 16, 1821, the Provincial Deputation of the State of Durango, Mexico, granted to Luis Maria Cabeza de Baca a large tract of land called "Las Vegas Grandes," situated in and around the town of Las Vegas, New Mexico. By the treaty of Guadalupe Hidalgo, of 1848 (9 Stat. 922), the territory embracing this land was ceded by the Republic of Mexico to the United States of America. In 1854, Congress passed an act (10 Stat. 308, c. 103), wherein, among other things, it was enacted that all claimants to lands within the ceded territory, under Mexican titles, should present and file their claims to

and with the Surveyor-general of New Mexico, and
that he, in turn, should report the same to Congress
for final action. Pursuant to the act, the town of
Las Vegas, New Mexico, presented a claim for "Las
Vegas Grant" and the heirs of Luis Maria Cabeza
de Baca presented a claim for the "Las Vegas
Grandes." The two opposing claims conflicted.
The history of these grants is given in the cases of
*Shaw* v. *Kellogg,* 170 U. S. 312, 42 L. Ed. 1050, 18
Sup. Ct. Rep. 632; *Maese* v. *Herman,* 183 U. S. 572,
46 L. Ed. 335, 22 Sup. Ct. Rep. 91; *Priest* v. *Las
Vegas,* 232 U. S. 604, 58 L. Ed. 751, 34 Sup. Ct. Rep.
443; *Lane* v. *Watts,* 234 U. S. 525, 58 L. Ed. 1440,
34 Sup. Ct. Rep. 965 (see also, Rose's U. S. Notes
for citation to these cases), and *Wise* v. *Watts,* 239
Fed. 207, 152 C. C. A. 195. The matter was re-
ported to Congress, and it was found by the Senate
Committee in charge of the matter that either claim,
in the absence of the other, was valid, and it was
recommended as a solution of the difficulty that the
Baca heirs be given the right to select other lands of
equal quantity, to be selected within the territory
then comprising New Mexico, and accordingly the act
of June 21, 1860 (12 Stat. 72, c. 167), was passed by
Congress; section 6 of the act providing as follows:

"Sec. 6. And be it further enacted, that it shall
be lawful for the heirs of Luis Maria Baca, who make
claim to the said tract of land as is claimed by the
town of Las Vegas, to select instead of the land
claimed by them, an equal quantity of vacant land,
not mineral, in the territory of New Mexico, to be
located by them in square bodies, not exceeding five
in number. And it shall be the duty of the Surveyor
General of New Mexico, to make survey and location
of the lands so selected by said heirs of Baca when
thereunto required by them: Provided, however, that
the right hereby granted to said heirs of Baca shall
continue in force during three years from the pas-
sage of this act, and no longer."

The historical facts show that, under and by virtue of the provisions of section 6 of said act of Congress, one John S. Watts, as an attorney for the heirs of Luis Maria Cabeza de Baca, on June 17, 1863, selected the land here involved as to taxation, as the third of the five tracts of land which were granted by the above-quoted section of the act; the application therefor being in words and figures following:

"Santa Fé, New Mexico, June 17, 1863.
"John A. Clark, Surveyor-general, Santa Fé, New Mexico:

"I, John S. Watts, the attorney of the heirs of Don Luis Cabeza de Baca, have this day selected as one of the five locations confirmed to said heirs under the 6th section of the act of Congress approved June 21, 1860, the following tract, to wit, commencing at a point one mile and a half from the base of the Salero Mountain in a direction running north forty-five degrees east of the highest point of said mountain, running thence from said beginning point west twelve miles thirty-six chains, forty-four links, thence south twelve miles thirty-six chains, forty-four links, thence east twelve miles thirty-six chains and forty-four links, thence north twelve miles thirty-six chains and forty-four links to the place of beginning, the same being situate in that portion of New Mexico now included by act of Congress approved February 24, 1863, in the Territory of Arizona. Said tract of land is entirely vacant, unclaimed by any one, and is not mineral of my knowledge.

"JOHN S. WATTS,
"Attorney for the Heirs of Luis Maria Cabeza de Baca."

The selection so made on behalf of the heirs of Baca was approved by the Surveyor-general of New Mexico on June 17, 1863, and on April 9, 1864, the Commissioner of the General Land Office approved that selection and ordered a survey thereof and directed that the plat and field-notes of such survey be returned to the General Land Office and filed therein. The land, however, was not surveyed until 1905, at

which time it was surveyed by one Phillip Contzen under directions of the Surveyor-general of Arizona. The plat and field-notes of the Contzen survey were not, however, filed or approved by the Secretary of the Interior or the Commissioner of the General Land Office until such action was required to be done after the decision of the United States Supreme Court hereinafter mentioned. In the meanwhile, various proceedings had been had in the Land Department looking to the cancellation and diminution in area of the tract selected by the Baca heirs. Commenced not so many years after the establishment of the General Land Office, these proceedings grew in importance and intricacy, until, aside from the title to the tract of land more than twice the area of the District of Columbia, vast mineral wealth and the rights of a multitude of settlers adversely claiming became involved. No less than six reported decisions were made by the department presenting the various aspects of the remarkable litigation. *Baca Float No. 3*, 5 Land Dec. 705; Id., 12 Land Dec. 676; Id., 13 Land Dec. 624; Id., 29 Land Dec. 44; Id., 30 Land Dec. 97 and 497. Finally, an action was brought by the grantees of the Baca heirs in the Supreme Court of the District of Columbia, to enjoin the Secretary of the Interior and the Commissioner of the General Land Office from acting upon certain attempted entries conflicting with the rights of the complainants and requiring that the Contzen survey be filed and approved. Judgment was rendered in favor of the complainants by the Supreme Court of the District of Columbia, holding that the act of the commissioner, April 9, 1864, approving the selection as made by John S. Watts, as attorney for the Baca heirs, June 17, 1863, had the effect to pass the title to the land to the heirs of Baca, and ordering that the Contzen survey be filed and approved. The government appealed from this judgment to the court of

appeals of the District of Columbia, where the judgment below was affirmed. 41 App. D. C. 139. The government again appealed, to the United States Supreme Court, and here, on June 2, 1914, the judgments below were affirmed. *Lane* v. *Watts,* 234 U. S. 525, 58 L. Ed. 1440, 34 Sup. Ct. Rep. 965. Pursuant to the judgment of the Supreme Court of the United States, the field-notes and plats of the Contzen survey were filed and approved, for the first time, December 14, 1914.

It is not disputed but that the defendants in the present action are the successors in interest of the Baca heirs, and it is also true that the assessments in controversy for the years 1913 and 1914 were made before December 14, 1914, the date on which the survey of the lands was approved and filed with the' Commissioner of the General Land Office. The defendants contended in the court below, and they contend in this court, that the lands in question were in no event taxable for the years 1913 and 1914, because a survey thereof had not been filed with the Commissioner of the General Land Office until a time after the making of the taxes for those years, in consequence of which the lands did not become segregated from the public domain so as to render them susceptible of taxation by the state of Arizona and county of Santa Cruz. But is that the precise point involved in the· matter of these assessments? By section 4847, Civil Code of 1913, it is provided as follows:

"The term 'real estate' whenever used in this act shall be taken to mean and include the ownership of, or claim to, or possession of, or right of possession to, any land or patented mine within the state; and the claim by possession of any person, firm, corporation, association, or company, to any land or patented mine shall be listed under the head of real estate. . . . "

It is to be observed that this statute expressly provides for the taxation of "claims to" land, as distinguished from the land itself. Under such a statute, the tax is not necessarily laid upon the land, but upon the "claim to" the land. That the legislature intended that this species of property should be taxed there can be no doubt, and we are not disposed to defeat that intention by technical distinctions and elaborate refinements and concepts. The "claim to" real property is often of great value and is such a right as may be sold and conveyed, and it may be inherited. This fact has been recognized and enunciated in many decisions of the courts. The cases cited by counsel for the defendants, as we read them, do not involve the precise question of taxing the "claim to" lands, but rather treat upon the question of taxing the land itself, and, in the absence of such a statute as the one just quoted, such decisions must be accepted as controlling. But we have here the question of taxing only the "claim to" land. The United States Supreme Court in *Lane* v. *Watts,* *supra,* declared that the order of the Commissioner of the General Land Office made on April 9, 1864, approving the selection of the lands made by John S. Watts for the Baca heirs on June 17, 1863, passed title to the heirs, but that a survey was necessary to segregate the land from the public domain. The survey was not accomplished until December 14, 1914. The defendants have succeeded to the interests of the Baca heirs. It may be difficult, technically, to define the "rights" of the defendants prior to the survey, but it is certain that they possessed a right of some kind. Counsel for the defendants says in his brief that—

"They merely had a right to a float which was to be fixed in some manner in the surrounding public domain."

The terminology of the right is not all-important. The right claimed by the defendants had been bought and sold by and between the defendants and their predecessors in interest, and they had often asserted the right by proceedings in the United States Land Office and by suits instituted in the courts. The right must necessarily have been of value. Stripped of all confusing technicalities, definitions and concepts, and broadly speaking, we think the right may be reasonably regarded as a "claim to" the land, having the quality of taxable property and liable to be taxed under the taxing statutes of the state, which provide that such a claim " . . . shall be listed under the head of real estate."

The defendants insist, however, that the right possessed by them could not be attached to any particular land until a survey was actually accomplished identifying the land and segregating it from the public domain. But we see no insuperable objections, based upon the argument of identification. The selection by John S. Watts, acting for the Baca heirs, sufficiently identifies the land for the purposes of assessing the defendant's claim thereto. The case shows that the defendants claimed the land prior to the making of the survey, by virtue of deeds which identified the land by reference to the congressional grant and also by the specific boundaries thereof given in the location of the grant made in 1863 (the Watts' location) and confirmed by the Commissioner of the General Land Office in 1864. *Wise* v. *Watts,* 239 Fed. 207, 152 C. C. A. 195. The case furthermore shows that these defendants, on the twenty-third day of June, 1914, and prior to the time that the survey of the land was filed and approved, went into the federal court in an action to quiet title to the land as between themselves, and succeeded in obtaining a decree establishing their respective rights. *Wise* v. *Watts, supra.* The identification of the land was, of

course, sufficient to authorize the decree. If the identification of the land was sufficient for that purpose, surely it is sufficient for the assessment of the defendants' "claim to" the land. The cases of *Delinquent Tax List* v. *Territory*, 4 Ariz. 186, 37 Pac. 370, 39 Pac. 328, *People* v. *Crockett*, 33 Cal. 150, and *Hale & Norcross Gold & Silver Min. Co.* v. *Storey County et al.*, 1 Nev. 104, directly support the foregoing views, and the cases of *Earhart* v. *Powers*, 17 Ariz. 55, 148 Pac. 286, and *Topeka Commercial Security Co.* v. *McPherson*, 7 Okl. 332, 54 Pac. 489, and Id., 52 Pac. 395–398, by analogy, lend support to the same views.

We think that the state had the power to tax the defendants' "claim to" the land for the years 1913 and 1914, without laying any tax upon the property of the government, in violation of the Enabling Act prohibiting the imposition of taxes upon government property.

Reverting to the appeal taken by the defendants from the judgment allowing the taxes for the years 1915 and 1916, it is to be observed, and the record shows, that the official survey of the grant (Baca Float No. 3) had been approved and filed in the proper office prior to the levy of the taxes for those years; hence the question which arose in the appeal of the state from the judgment disallowing the taxes for the years 1913 and 1914 does not arise in the appeal of the defendants, now under discussion.

The defendants rely for a reversal of the judgment allowing the taxes for the years 1915 and 1916, on the following assignment of error:

"The court erred in rendering judgment for the state for the taxes for the years 1915 and 1916, in that the purported assessments reach first to unknown owners, secondly to Watts and Davis for the south half of the float, and thirdly to the Bouldins for the north one-half, and then to other persons,

and that no valuation is attempted to be extended or assessed upon the respective tracts owned in severalty, but an assessment is attempted upon the whole tract, regardless of the separate and distinct ownership of the north and south half.''

Paragraph 4860, Civil Code of 1913, in part, provides as follows:

''If any person . . . shall be absent or unknown, the assessor shall fill out a list for such person, putting therein all taxable property which he has reason to' believe is owned by, or in the possession or control of, said person, officer, or agent, liable to taxation. If the name of such absent owner is known to the assessor, the property shall be assessed in his, her, their or its name; if unknown to the assessor, the property shall be assessed to 'unknown owner.' ''

In the memorandum opinion of the trial judge, we find a very clear and correct statement of the method of the assessment of the taxes for the years 1915 and 1916, as shown by an examination of the assessment-roll appearing in the record, and we feel at liberty to adopt and utilize this statement, using for illustration the assessment for the year 1915, which is substantially the same as that of 1916. The situation is this: Under the head of ''Name of Present Owner'' appears first the expression ''unknown owners.'' Under the head ''Years for which Taxes are due'' appears, ''1915.'' Under the head of ''Name of Owners at the Time of the Assessment'' appears, ''Unknown owners.'' In this respect the assessment of 1915 differs from that of 1916, in that in the latter the designation is, ''Unknown owners or claimants of Baca Float No. 3.'' Under the head of ''Description'' appears, ''Baca Float Location No. 3,'' the word ''Location'' being omitted in the 1916 assessment. Here follows, under the various heads, the different character of taxes and statement of the amounts of such taxes assessed, followed under ap-

propriate headings by the total amount of taxes, amount of interest, clerk's fees and penalties, followed by the total amount of taxes, interest, costs and penalties. We think the assessment, fairly construed, amounts only to an assessment against unknown owners and is to be regarded as a sufficient compliance with the statute. Had the assessor stopped after assessing the entire tract to unknown owners, no question would have arisen as to the validity of the assessment; but some confusion has occurred because of subsequent entries appearing in the assessment-roll, of the names of the various claimants to the tract of land, with an apparent attempt to describe the several portions of the tract claimed by these parties. The entries referred to stopped with the names of the claimants and the attempted but crude and imperfect description, no extension of the valuation of the several portions or interest, no carrying out of any amounts of taxes, and no carrying out of any totals was made in connection with these last-mentioned entries. The trial judge regarded these entries as surplusage and of no legal effect, leaving the assessment simply one to unknown owners and as such constituting a valid assessment. In this conclusion we agree with the trial judge. The title to the tract of land, as between adverse claimants, was not definitely determined until February 13, 1917, the date of the decision of the circuit court of appeals in the case of *Wise* v. *Watts*, *supra*. From the date of the selection of the land by Watts, acting as attorney for the Baca heirs, the title thereto had been the subject of constant litigation in the courts or before the Land Department. It could not be expected, in view of the fact that the title was in litigation, that the assessing officer could determine who were the owners of the property.

Where title to property is in litigation and the assessor has no means of determining what may be the

ultimate result of the litigation, or the ultimate determination as to the ownership of the property, he may safely assess the property to unknown owners. *Himmelmann* v. *Steiner,* 38 Cal. 175; *French* v. *Spalding,* 61 N. H. 395. In the case of *French* v. *Spalding, supra,* the Supreme Court of New Hampshire said:

"It is often a nice question who the real owner of a tract of land is. Disputes are continually occurring, and much of the time of courts is occupied in determining the ownership of disputed tracts. It was not intended that assessors should be required to decide upon *ex parte* and imperfect testimony which of two or more claimants is the actual owner of a piece of land upon which they are called to assess a tax. When there is a dispute as to the title, or the assessors have any reasonable doubt as to the name of the owner or of the original proprietor, they may tax it in the name of 'owner unknown,' in addition to 'such description as the land may be readily known by.' . . ."

Some contention has been made that the defendants could not contest the validity of the taxes, without first paying the amount of the taxes assessed; but a determination of that question is not essential to the disposition of the two appeals, and we therefore express no opinion in reference thereto.

That portion of the judgment of the trial court disallowing the taxes for the years 1913 and 1914 will be reversed, with directions to the trial court to reform its judgment in that respect and allow the taxes for those years; otherwise the judgment is affirmed.

CUNNINGHAM, C. J., and ROSS, J., concur.