CHRISTIANSON v. KING COUNTY.

(District Court, W. D. Washington, N. D. May 7, 1912.)

No. 1,969.

1. STATUTES (§ 54*)—LEGISLATION—ESCHEAT.

In the absence of congressional action on the subject, a territorial Legislature had power to pass Wash. Ter. Laws 1862–63, p. 261, § 340, providing that, if an intestate shall leave no kindred, his estate shall escheat to the county in which the estate may be situated.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. § 52; Dec. Dig. § 54.*]

2. STATUTES (§ 55*)—LEGISLATIVE POWER—DISPOSAL OF SOIL.

Wash. Ter. Laws 1862–63, p. 261, § 340, in so far as it provided for the escheat of lands to the county in which the lands were situated, was not in violation of Washington Organic Act, providing that the Legislature should pass no law interfering with the primary disposal of the soil, the term "primary disposal of the soil," as used in such act, having reference only to the disposal of public lands of the United States by the officers or agents of the government to some person, who, having the qualifications to acquire such lands, and having complied with the terms of the law, is entitled to a conveyance by patent or deed without any reserved authority in the government or its officers to withhold the same.

[Ed. Note.—For other cases, see Statutes, Dec. Dig. § 55.*]

3. STATUTES (§ 124*)—TITLE—PROBATE PRACTICE ACT.

Wash. Ter. Laws 1862–63, p. 198, entitled "An act defining the jurisdiction and practice in the Probate Courts of Washington Territory," was not invalid in so far as it provided for the distribution of estates, in that the provision for escheat to the county in which an estate might be situated in case an intestate died without kindred was not within the title of the act.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. §§ 184–186; Dec. Dig. § 124.*]

4. ESCHEAT (§ 6*)—PROBATE COURTS—JURISDICTION.

Wash. Ter. Laws 1862–63, p. 198, defining the jurisdiction and practice in the probate courts in Washington Territory (section 317), provided

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

that, on the settlement of the accounts of an executor or administrator, the court shall proceed to distribute the residue of the estate among the persons who are by law entitled thereto, and section 318 declares that in the decree the court shall name the person and the portion or parts to which each shall be entitled, and such persons shall have the right to demand and recover their respective shares from the executor or administrator having the same in their possession. Section 340 provides for the descent of real property, and subdivision 8 declares that, if the intestate shall leave no kindred, his estate shall escheat to the county in which such estate may be situated. *Held,* that the probate court had jurisdiction to determine that there were no children or lineal descendants of an intestate, and that intestate's real property, therefore, escheated to the county.

[Ed. Note.—For other cases, see Escheat, Cent. Dig. § 9; Dec. Dig. § 6.*]

**5. NAMES (§ 20*)—CHANGE OF NAME—LEGAL PROCEEDINGS.**

A man may lawfully change his name without resorting to legal proceedings, and for all purposes the name assumed by him will constitute his legal name, and legal proceedings instituted against him under the assumed name will bind him and those claiming under him.

[Ed. Note.—For other cases, see Names, Cent. Dig. § 54; Dec. Dig. § 20.*]

At Law. Action by Thomas Christianson against King County. On demurrer to complaint. Sustained.

Edward Judd, S. S. Langland, and Walter A. Keene, for plaintiff. John F. Murphy and Robert Evans, for defendant.

RUDKIN, District Judge.. This is a statutory action to recover possession of real property, and to quiet title in the plaintiff. The complaint is somewhat voluminous, and was doubtless prepared with a view of presenting, on the face of the pleadings, the more important questions of law involved in the case.

It appears from the complaint that Lars Torgerson Grotnes was born in the city of Porsgrund, in the present kingdom of Norway, on the 30th day of August, 1829. When he arrived at the age of majority, he shipped as a sailor from his native city, went by way of England to Australia, and thence to the city of San Francisco, in the state of California, where he arrived in the year 1856. On his arrival in San Francisco he deserted the ship on which he was employed because of abuse and ill treatment, and changed his name from Lars Torgerson Grotnes to John Thompson, in order to conceal his identity, and thus avoid apprehension. He then came north to the vicinity of Elliott Bay, in King county, and resided in the counties of King and Kitsap, in the territory of Washington, until his death in the year 1865. While residing in King county he acquired title to 160 acres of land, the greater part of which is now in controversy, under his assumed name of John Thompson. On the 26th day of March, 1865, one Daniel Bagley was appointed administrator of the estate of John Thompson, deceased, by the probate court of King county. Such proceedings were had in the settlement of the estate that on the 26th day of May, 1869, a final decree of distribution was entered, which recited, among other things, that

the administrator had obtained an order settling and allowing his final account on the 12th day of February, 1869, that a time had been fixed for hearing the application for a decree of distribution, and that due and legal notice of such hearing had been given. The decree then proceeded as follows:

"That said administrator has fully accounted to the court for all of the said estate that has come into his hands, and that the said estate, so far as discovered, has been fully administered, and the residue thereof consisting of the property hereinafter mentioned is ready for distribution; that all of the debts of the said deceased and of said estate and all the expenses of administration have been paid, and the said estate is in condition to be closed; that the decedent died intestate in the county of King, territory of Washington, on the ——— day of March, 1865, leaving no heirs surviving him; there being no heirs of the said deceased, that the entire estate escheats to the county of King, territory of Washington. Therefore on this 26th day of May, 1869, no objections being made or filed, it is hereby ordered, adjudged, and decreed that all of the acts of the said administrator as reported to this court, and as appearing on the records thereof, be and the same are hereby approved and confirmed; that, after deducting the estimated expenses of closing said estate, the residue of said estate of John Thompson, deceased, not heretofore distributed, hereinafter described, and now remaining in the hands of said administrator, and any other property not now known or discovered, which may belong to the said estate or in which the said estate may have an interest, be and the same is hereby distributed as follows, to wit: The entire estate to the county of King, in Washington territory. The following is a particular description of the said residue of the said estate referred to in said decree and of which distribution is ordered, adjudged, and decreed, to wit: 160 acres of land on Duwamish river, more particularly described in a certain deed from Joseph Williamson and William Greenfield to Thompson dated January 19, 1865, and recorded in volume 1 of Deeds, p. 458 (and personal property). Dated May 26, 1869."

The complaint then avers that this decree was null and void; that the probate court was without jurisdiction to declare an escheat; that all claims of the defendant and all acts done by the defendant in reference to the land in controversy have been done, performed, and exercised under and by virtue of this void decree; that the defendant has no contract, deed, conveyance, decree, judgment, or other writing evidencing or purporting to evidence any title on its part in or to said lands, and that the defendant has never at any time instituted any suit or legal proceeding of any nature before any court, officer, or tribunal for the purpose of having an escheat of said lands adjudicated or declared, nor has any public authority or officer ever begun or instituted any such suit or legal proceeding. The complaint next avers that upon the entry of the decree in the probate court the property in controversy was marked on the assessment rolls of the county as county property and as exempt from taxation, and has ever since been so treated, except certain portions thereof which the defendant has assumed to convey to private parties by deed; that in the year 1885 the county of King, in the then territory of Washington, took possession of a certain portion of the tract, which said portion remained in its possession after the organization of the state of Washington, and is generally known as the "King County Farm," which is specifically described in the complaint; that the last-described tract has never been used for any

county purpose, but has been leased to tenants for the purpose of producing a revenue for the county; that about the year 1900 the defendant took possession of another portion, known as the "King County Hospital Grounds," which is specifically described in the complaint; that the defendant has placed upon the last-described tract valuable improvements in the shape of a hospital building and its appurtenances, the value of which is to the plaintiff unknown, and since thus taking possession the county has used and is now using the same for county hospital purposes; that in the year 1892 the defendant assumed to make a plat of a certain portion of the tract called the "King County addition to the city of Seattle," and caused the plat thereof to be recorded in the office of the auditor of King county as required by law; that the defendant has assumed to sell and convey to private parties all of the lots and lands composing this addition, except certain portions which are specifically described in the complaint; that in the year 1903 the defendant assumed to make a further plat of a certain portion of the tract called "King County second addition to the city of Seattle," and caused the plat thereof to be recorded in the office of the auditor of King county, as required by law; that the defendant has assumed to sell and convey to private parties all of the lots and lands composing this addition, except certain portions which are particularly described in the complaint; that the tracts of land described as the "King County Farm," "King County Hospital Grounds," "King County addition to the City of Seattle," and "King County Second addition to the city of Seattle," comprise the whole tract acquired by Grotnes or Thompson, except certain portions which have been appropriated for public purposes. The complaint further avers that the plaintiff herein is a son of the sister of Lars Torgerson Grotnes and one of his heirs at law, and that all the now living heirs at law of Grotnes have, by proper mesne conveyances, conveyed their right, title, and interest in and to the lands described in the complaint to this plaintiff, who is now the sole owner in fee thereof. It is further averred that the heirs at law of Grotnes had no knowledge of what had become of him, did not learn of his death or the place in which he died, or of the fictitious name which he had assumed until within three years last past, and that since learning thereof such heirs, and particularly the plaintiff, have been diligently engaged in searching for and procuring the proper proofs of the identity of Lars Torgerson Grotnes and John Thompson and his relationship to them. To this complaint the defendant has interposed a demurrer on the grounds, among others, that the complaint does not state facts sufficient to constitute a cause of action, and that the action has not been commenced within the time limited by law.

At the time of the death of Grotnes, or Thompson, the Probate Practice Act of January 16, 1863 (Laws of 1862–63, p. 198), entitled "An act defining the jurisdiction and practice in the probate courts of Washington Territory," was in force. Chapter 16 of that act provides for the partition and distribution of estates, chapter 17 for

the descent of real property, and chapter 18 for the distribution of personal property. Section 317 of the act provides that:

"Upon the settlement of the accounts of the executor or administrator, or at any subsequent time, upon the application of the executor or administrator, or any heir, devisee or legatee, the court shall proceed to distribute the residue of the estate, if any, among the persons who are by law entitled."

Section 318 provides that:

"In the decree the court shall name the person and the portion, or parts to which each shall be entitled; and such persons shall have the right to demand and recover their respective shares from the executor or administrator, or any person having the same in possession."

Section 319 provides that:

"The decree may be made on the application of the executor or administrator, or of any person interested in the estate, and shall only be made after notice has been given in the manner required in regard to an application for the sale of land by an executor or administrator. The court may order such further notice to be given as it may deem proper."

Section 340 provides:

"When any person shall die seised of any lands, tenements, or hereditaments, or any right thereto, or any title to any interest therein, in fee simple, or for the life of another, not having lawfully devised the same, they shall descend, subject to his debts, as follows:"

The first seven subdivisions prescribe the rule or order of descent among the different degrees of kindred, and the eighth subdivision declares:

"If the intestate shall leave no kindred, his estate shall escheat to the county in which such estate may be situate."

Section 353 provides for the distribution of the personal estate, and the seventh subdivision reads as follows:

"If there be no husband, or kindred of the intestate, the said personal estate shall escheat to the county in which the administration is had, and a receipt by the county treasurer of the county to whom such personal property shall be conveyed by the administrator, shall be a full discharge of all responsibility to the said administrator."

The defendant contends, first, that the decree of distribution or escheat, made after due notice, pursuant to this statute, is binding upon the plaintiff and upon all the world; and, second, that in any event it appears from the face of the complaint that the action is barred by the statute of limitations and by laches. The plaintiff, on the other hand, contends:

First. That property in a territory which escheats for want of heirs goes to the United States, and not to the territory or any county therein.

Second. That the act violates section 1851 of the Revised Statutes, which declares that:

"The legislative power of every territory shall extend to all rightful subjects of legislation not inconsistent with the Constitution and laws of the United States. But no law shall be passed interfering with the primary disposal of the soil; no taxes shall be imposed upon the property of the United States; nor shall the lands or other property of non-residents be taxed higher than the lands or other property of residents."

Third. That the act violates section 1924 of the Revised Statutes, which contains the following provisions:

"To avoid improper influences, which may result from intermixing in the same act such things as have no proper relation to each other, every law shall embrace but one object, and that shall be expressed in the title."

And, lastly, that an escheat can only be enforced by a common-law proceeding in the nature of an inquest of office, and that the territorial Probate Court had no common-law jurisdiction.

[1] I will first consider briefly the several objections urged against the validity of the territorial statute by the plaintiff. The first objection is in my opinion without merit. As already stated, the legislative power of the territory extended to all rightful subjects of legislation, and a statute providing for the descent and distribution of property in cases of intestacy would certainly seem to fall within that category. The act was never disapproved by Congress. Section 1850, U. S. R. S: Its validity has been recognized by both state and federal Courts (Territory v. Klee, 1 Wash. 183, 23 Pac. 417; Pacific Bank v. Hannah, 90 Fed. 72, 32 C. C. A. 522), and in the language of the court in Crane v. Reeder, 21 Mich. 24, 4 Am. Rep. 430:

"Congress' never legislated on the subject, and there never has been an instance of an escheat claimed to have accrued to the United States since they came into existence."

Again the court said:

"We have no tenures which would stand between the government and the estate, and it becomes, therefore, a very narrow inquiry where the escheat shall go. * * * It would seem to be an obvious answer that it must go where the law directs. Tenures and their incidents, the rules of inheritance, are all the creatures of the law, and, except as to rights already vested, may be changed and modified at pleasure. And it was for the lawmaking power that could control lands and their enjoyment in Michigan to direct where lands should go for default of heirs, as it was to direct who should be regarded as heirs at all; for there is no such thing as a natural line of inheritance independent of the law. * * * If Congress had seen fit to provide for such cases, we think it had power to do so. We are not prepared to question its authority on any theoretical grounds arising out of the conditions of cession, although those conditions are significant in construing the ordinance. This region was acquired by treaty, and did not come into the actual possession of the United States until after the Constitution was adopted, and it was held in United States v. Repentigny that the United States succeeded directly to the rights of the French and British governments which had complete supremacy. But the articles of confederation made no provision for the direct legislation of Congress over the local affairs of any part of the country, and such direct government, while possibly it might have been lawful would have been at variance with the whole theory of local government, which had been acted upon both by states and colonies. The delegation of legislative powers to the territories was practically a necessity, and the Ordinance of 1787, while retaining a right of veto or disapproval of the acts of the governor and judges, provided expressly that such laws as are not disapproved shall only be repealed by local authority. No one can read the ordinance without perceiving that it was intended to throw the whole regulation of local affairs upon the local government. The public lands were not to be interfered with till they had been severed from the public domain by primary disposal. But, when they had become private property, they came, like all private rights, under local regulation. * * * Immediately after the government of the United States was organized under the Constitution, a brief statute was passed to adapt the ordinance to the Constitution,

not to change its nature, but, as stated in the preamble, in order that it 'may continue to have full effect.' And, so long as the system should continue, the whole local regulation was clearly delegated to the territory, as it was afterwards to Michigan when separately organized. * * * Even under the old common-law notions the creation of such a government would be at least an equivalent to the erection of a county Paletine, and would transfer all necessary sovereign prerogatives. But, under this ordinance, the territory only differed from a state in holding derivative instead of independent functions, and in being subject to such changes as Congress might adopt. But, until revoked or annulled, the act of the territory was just as obligatory as the act of Congress, and for the same reason."

[2] The statute does not interfere with the primary disposal of the soil. That term is used in reference to the public lands of the United States, and means their disposal by the officers or agents of the government to some person who, having the qualifications to acquire such lands, and having complied with the terms of the law, is entitled to a conveyance by patent or deed without any reserved authority in the government or its officers to withhold the same. Topeka Commercial Security Co. v. McPherson, 7 Okl. 332, 54 Pac. 489; Crane v. Reeder, supra. Mormon Church v. United States, 136 U. S. 1, 10 Sup. Ct. 792, 34 L. Ed. 478, Territory v. Lee, 2 Mont. 124, and Williams v. Wilson, Mart. & Y. (Tenn.) 248, cited by the plaintiff, are not in point. In the Mormon Church Case the act of Congress explicitly declared that the property should be forfeited to the United States. In the Montana case the territorial Legislature attempted to forfeit to the territory possessory rights in mining claims held by aliens, while the title to the property was vested in the general government. In the Tennessee case it does not appear that there was any territorial legislation on the subject, or that there was any territorial government to which the property could escheat.

[3] The next contention is that the provisions of the Probate Practice Act of 1863, relating to wills and to the descent and distribution of property, are not within the title of the act, and therefore void. Mere lapse of time and a proper regard for the stability of titles forbid an inquiry into this question at this late day. All our probate laws have been enacted under similar titles, their validity has been recognized by the courts, and acquiesced in by the people, for upwards of half a century, and to overthrow them now would unsettle half the titles in the state. Furthermore, if the question were a new one, the objection is not tenable. It is conceded that the provision relating to the distribution of estates is within the title, and, if so, it is but a short step to provide to whom distribution shall be made; otherwise the provision for distribution itself would be wholly inoperative.

[4] It is lastly contended that the probate court had no jurisdiction to determine the rights of those claiming adversely to the estate, and that it had no jurisdiction to declare or decree an escheat. The first proposition will be acceded to if claims adverse to the intestate are meant, but, if it means the conflicting claims of those claiming under the intestate, the proposition is wholly without merit, for such power is exercised by probate courts every day; in fact, that is the principal office of a hearing on the application for a de-

cree of distribution. Whether the probate court had jurisdiction to declare or decree an escheat depends entirely upon the construction of the local laws of the territory. It will be conceded that the usual form of proceeding for this purpose at common law was by an inquisition or inquest of office before a jury, but whether this or some other form of proceeding shall be resorted to depends wholly upon the legislative will. As said by the court in Hamilton v. Brown, 161 U. S. 256, 263, 16 Sup. Ct. 585, 587 (40 L. Ed. 691):

"In this country, when title to land fails for want of heirs and devisees, it escheats to the state as part of its common ownership, either by mere operation of law, or upon an inquest of office, according to the law of the particular state."

There is nothing sacred about this or any other rule of the common law; for, as said by the court in Munn v. Illinois, 94 U. S. 113, 134 (24 L. Ed. 77):

"A person has no property, no vested interest, in any rule of the common law. That is only one of the forms of municipal law, and is no more sacred than any other. Rights of property which have been created by the common law cannot be taken away without due process; but the law itself, as a rule of conduct, may be changed at the will, or even at the whim, of the Legislature, unless prevented by constitutional limitations. Indeed, the great office of statutes is to remedy defects in the common law as they are developed, and to adapt it to changes of time and circumstances."

It was therefore entirely competent for the Legislature to provide that the territory or one of its counties should be the ultimate heir of those dying intestate and without other heirs or kindred; and it was further competent for it to provide that the rights of the territory or the county should be determined by the probate court in the administration proceeding in the same manner and by the same procedure as the rights of any other claimant to the estate.

It is conceded that, under section 340 of the Probate Act relating to the descent of real property, it would have been entirely competent for the court to determine that there were no children or lineal descendants of the intestate under subdivision 1, and to distribute the property to the father under subdivision 2. It would likewise have been competent for that court to determine that there was no father or lineal descendants under subdivisions 1 and 2 and to distribute it to the brothers and sisters under subdivision 3. Its determination upon these questions after due notice and hearing, on well-established principles, would be binding upon the whole world. Magee v. Big Bend Land Co., 51 Wash. 406, 99 Pac. 16; In re Ostlund's Estate, 57 Wash. 359, 106 Pac. 1116, 135 Am. St. Rep. 990; Case of Broderick's Will, 21 Wall. 503, 22 L. Ed. 599; Proctor v. Dicklow, 57 Kan. 119, 45 Pac. 86.

Why was it not equally competent for the probate court to determine that there were no kindred, and to escheat the property to the county? In my opinion such was the legislative intent, and this view of the subject is strengthened by reference to subdivision 7 of section 353, relating to the distribution of personal property. It is there provided that, if there be no husband, widow, or kindred of the intestate, the personal estate shall escheat to the county, and

the administrator shall convey it to the county treasurer. The provision is not that the administrator shall convey it to the county treasurer, if not claimed by husband, widow, or kindred, but that he shall convey it if there are none such, and the probate court was necessarily invested with jurisdiction to determine that question. This view is further strengthened by the fact that the provision of section 480 of the Civil Practice Act of 1854 (Laws 1854, p. 218), authorizing the prosecuting attorney to file an information in the District Court for the recovery of property escheated or forfeited to the territory, was eliminated by the Civil Practice Act of 1863 (Laws 1862–63, p. 192), and since 1863 there was no provision in the laws of either the territory or state, in relation to escheats, except those found in the Probate Practice Act, until the passage of the Act of 1907, p. 253. 1 Rem. & Bal. Code, § 1356 et seq. The latter act left the subject of escheats to be dealt with by the court administering the estate as before, limiting only the time within which heirs must appear to claim the estate. The probate courts of the territory and the superior courts of the state have uniformly assumed jurisdiction in this class of cases, and the right of the state or county to appear in the probate proceeding and contest the rights of other claimants has been recognized by the highest court of the state. In re Sullivan's Estate, 48 Wash. 631, 94 Pac. 483, 95 Pac. 71. For these reasons, I am of opinion that a valid title was vested in the county by the decree of the probate court, and that the complaint states no cause of action. This view of the case renders it unnecessary to consider the question of adverse possession. If the complaint contains a defense on that ground, it will at once be conceded that the pleading is very inartificially drawn with that object in view, but nevertheless it is difficult to escape the conclusion that the county has held the property adversely under color of title and claim of right far beyond the statutory period.

[5] I have not overlooked the fact that the complaint avers that Grotnes changed his name, but I assume that this allegation was inserted for the purpose of avoiding a charge of laches against the heirs. In any event, it is well established that a man may lawfully change his name, without resorting to legal proceedings, and for all purposes the name thus assumed by him will constitute his legal name, just as much as if he had borne it from birth; and legal proceedings instituted against him under the assumed name will bind him and those claiming under him. 29 Cyc. 271.

The demurrer is sustained.