985 P.2d 574

**AIRPORT PROPERTIES, aka Airport Properties Phase I, an Arizona limited partnership; and Air Commerce Center, L.L.C., an Arizona Limited Liability Company, Plaintiffs–Appellees,**

v.

**MARICOPA COUNTY, Arizona, Defendant–Appellant.**

No. 1–CA–CV–97–0597.

Court of Appeals of Arizona, Division 1, Department C.

Jan. 19, 1999.

Review Denied Sept. 21, 1999.

---

Helm & Kyle, Ltd by John D. Helm, Roberta S. Livesay, Michelle M. Tran, Tempe, Attorneys for Appellant Maricopa County.

Robert R. Bauer, Phoenix, Attorney for Appellees Airport Properties and Air Commerce Center.

Grant Woods, Attorney General by Linda D. Bach, Assistant Attorney General, Phoenix, Attorneys for Appellee Arizona Department of Revenue.

## OPINION

EHRLICH, Judge.

¶ 1   Maricopa County appeals from summary judgment entered for Airport Properties ("AP") and Air Commerce Center, L.L.C. ("ACC") in consolidated actions challenging the County's right (1) to tax AP's and ACC's interests in Scottsdale Municipal Airport real property as class three (commercial) property for tax years 1993 and 1994, and (2) to assess any ad valorem property taxes at all against those interests after the 1995 repeal of Arizona's possessory interest taxing scheme, former ARIZ.REV.STAT. ANN.

("A.R.S.") sections 42–681 through 42–687. Listed in their logical order, the appeal presents these issues:

(1) Whether the legal nature of ACC's interest in Scottsdale Municipal Airport real property constituted in reality an improvement on a possessory right ("IPR") rather than a possessory interest;

(2) Whether the County had "standing" to challenge the constitutionality of Arizona's possessory interest and IPR taxing schemes or the legislature's repeal of the possessory interest taxing scheme;

(3) Whether the trial court violated the No–Exemption Clause of the Arizona Constitution, ARIZ. CONST. Art. 9, sec. 2(12) (Supp.1997),[1] in holding that the legislature's repeal of Arizona's possessory interest taxing scheme precluded the County from taxing possessory interests after its effective date;

(4) Whether Arizona's general personal property taxing provisions authorized the County to assess and tax possessory interests in and after 1995 independently of Arizona's repealed possessory interest taxing scheme; and

(5) Whether Arizona's possessory interest taxing scheme violated, and its IPR taxing scheme violates, the Uniformity Clause of the Arizona Constitution, ARIZ. CONST. Art. 9, section 2(1).

## I. BACKGROUND OF APPLICABLE STATUTORY AND CASE LAW

¶ 2   In Cutter Aviation, Inc. v. Arizona Department of Revenue, 191 Ariz. 485, 958 P.2d 1 (App.1997), review denied June 25, 1998, we recounted in detail the legislative and decisional history of a controversy with facts similar to those of these taxpayers' in many respects. For this case, we present a summary of that history with only the detail necessary to facilitate understanding the issues before us.

¶ 3   In 1985, the legislature enacted provisions subjecting "possessory interests," defined as rights to possess and actual possession of land or improvements under nonfreehold rights, to ad valorem taxation. A.R.S. §§ 42–681 through 42–686 (1991)(repealed effective retroactively to January 1, 1995). These statutes applied to private possessory rights in government real property. Certain specifically-described possessory interests were either exempted from the tax outright or benefitted from valuation reduction formulae. The possessory interests subjected to taxation were assessed at 1% of full cash value.

¶ 4   In 1994, the legislature enacted amendments and revisions yielding the possessory interest and IPR taxing schemes with which this appeal is concerned. ARIZ. SESS. LAWS Ch. 293, § 8, retroactively effective to January 1, 1993. The law now provides:

In this article, unless the context otherwise requires:

* * *

3. "Possessory interest" means possession of public property pursuant to an agreement with a governmental entity regardless of how the interest is identified in any document by which it is created, except possession pursuant to and by virtue of ownership of a freehold interest in the real property or ownership of the improvements or personal property.

A.R.S. § 42–681(3).

¶ 5   The 1994 legislation retained A.R.S. section 42–162(A)(12)(c) in its pre–1994 form. That section included within class twelve:

(c) Interests in property located on state, city, town or county airports and public airports operating pursuant to sections 2–311, 2–312 and 2–313, if the property is used for or in connection with aviation, including hangars, tie-downs, aircraft maintenance, sales of aviation[-]related items, charter and rental activities, parking facilities and restaurants, stores and other services located in a terminal.

---

1.  The No–Exemption Clause was designated as section 2(6) of ARIZ. CONST. Art. 9 during the tax years at issue in these appeals. It was renumbered as section 2(12) in accordance with amendments adopted at the election of November 5, 1996, effective December 6, 1996.

Possessory interests were assessed at 1% of full cash value. Former A.R.S. § 42–227(A)(12).

¶ 6   The 1994 legislation also added a new class thirteen, retroactively effective to January 1, 1993. This class included:

(b) Improvements located on public property, as defined in section 42–681, owned by the lessee of such public property [IPRs] provided:

(i) That the improvements shall become the property of the owner of the public property upon termination of the possessory interest in the public property.

(ii) That both the improvements and the public property are used for or in connection with aviation, including hangars, tie-downs, aircraft maintenance, sales of aviation-related items, charter and rental activities, parking facilities and restaurants, stores and other services located in a terminal.

(iii) That both the improvements and the public property are located on a state, county, city or town airport or a public airport operating pursuant to sections 2–311, 2–312 and 2–313.

Like possessory interests, IPRs classified under A.R.S. section 42–162(A)(13) are assessed at 1% of full cash value. Former A.R.S. § 42–227(A)(13); *see* A.R.S. § 42–162(A)(11) (Supp.1997); § 42–227(A)(11) (Supp.1997).

¶ 7   In section 8 of 1995 ARIZ. SESS. LAWS ch. 294, the legislature repealed A.R.S. sections 42–681 through 42–687, effective retroactively to January 1, 1995. The repeal did not affect the taxation of IPRs.

## II.   OUTLINE OF FACTS AND PROCEDURE BELOW

¶ 8   The pertinent facts are undisputed. Under lease agreements with the City of Scottsdale, AP built air services related improvements on city land at Scottsdale Municipal Airport. ACC succeeded to AP's interest in one such lease in July 1993. Both taxpayers operated air services businesses using those improvements and portions of airport land throughout tax years 1993, 1994 and 1995.

¶ 9   During the decade preceding tax year 1993, the County viewed AP as holding leasehold interests in improvements owned by the City of Scottsdale. It treated AP's interests in the improvements as exempt from ad valorem taxation. For tax year 1993, however, the County took the position that AP and ACC themselves owned the improvements. For tax year 1993, the County classified the improvements occupied by AP as class three (commercial) property and assessed them at 25% of full cash value. A.R.S. § 42–162(A)(3); § 42–227(A)(3). For the second half of 1993, it accorded the same treatment to the improvements ACC had occupied since July of that year. For tax years 1994 and 1995, the County continued to treat the improvements as owned by the taxpayers, but it assessed them as IPRs at 1% of full cash value pursuant to former A.R.S. sections 42–162(A)(13) and 42–227(A)(13).

¶ 10   The taxpayers challenged their assessments for 1993, 1994 and 1995. After resorting to and exhausting applicable administrative remedies, they brought two property tax appeals in the superior court, later consolidated. In a series of motions and cross-motions for summary judgment, the court ruled: (1) a 1979 judgment precluded the County from taking the position that AP and not the City of Scottsdale owned the airport improvements that it occupied; (2) under the lease assigned by AP to ACC in July 1993, the City of Scottsdale retained ownership of the improvements that ACC occupies under that lease; (3) the repeal of the possessory interest taxing scheme effective beginning with the 1995 tax year did not violate the No–Exemption Clause of the Arizona Constitution; and (4) the 1% assessment ratio provided for possessory interests during 1993 and 1994 and for IPRs during 1994 and 1995 did not violate the Uniformity Clause.

¶ 11   The substance and practical effects of the superior court's rulings were as follows:

● For tax year 1993, in which possessory interests were assessed and taxed at 1% of full cash value and IPRs were not classified as such, AP's and ACC's interests in the airport improvements they occupied

were assessed and taxed at 1% of full cash value as possessory interests rather than at 25% of full cash value as class three (commercial) property wholly owned by the taxpayers.

• For tax year 1994, the first year in which IPRs were assessed and taxed at 1% of full cash value, AP's and ACC's interests in the airport improvements remained taxable at 1% of full cash value as possessory interests.

• For tax years 1993 and 1994, AP's and ACC's airport improvement interests were not taxable at 25% of full cash value as class three (commercial) property on the County's theory that the possessory interest and IPR classifications of former A.R.S. section 42–162(A)(12) and (13) effectively caused differential taxation of classes of property with no real differences in use, utility, productivity or physical characteristics, in violation of the Uniformity Clause.

• For tax year 1995, the first year in which the repeal of Arizona's possessory interest taxing statutes was effective, AP's and ACC's airport improvement interests were no longer liable for ad valorem property taxes because the repeal removed the required statutory mechanism for taxing possessory interests and signified the legislature's intent that such interests not be taxed. AP's and ACC's interests were not liable for taxation as class three (commercial) property on the County's theory that the repeal amounted to a legislative exemption from property taxation beyond the scope of its authority under ARIZ. CONST. Art. 9, sec. 2, and in violation of the No–Exemption Clause.

¶ 12  The superior court entered judgment in accordance with its rulings, and the County appealed. We have jurisdiction pursuant to A.R.S. section 12–2101(B)(1994).

### III.  ANALYSIS

A.  *Nature of ACC's Legal Interest in its Airport Improvements*

¶ 13  For tax years 1993 and 1994, the County asks us to reverse the superior

court's ruling that the City of Scottsdale and not the ACC owned the airport improvements that ACC occupied.[2]  The County argues that, in accord with the terms of the lease, ACC is clearly the owner of the improvements.  The County also argues that ownership in the tax context is "distinct from legal title, and instead is determined by analyzing which party enjoys the economic benefits and bears the economic burdens of a piece of property."  It urges that, under the terms of the lease, this indicator points directly at ACC.

¶ 14  We do not share this view of ACC's lease.  Our view of its provisions is guided by the analyses presented in *Maricopa County v. Novasic*, 12 Ariz.App. 551, 473 P.2d 476 (1970), and our recent decision in *Cutter Aviation*, 191 Ariz. 485, 958 P.2d 1.

¶ 15  Like AP in this case, the predecessor in interest to the taxpayer in *Novasic* entered a lease with an Arizona city for unimproved land at the municipal airport. The lease variously provided that, in the event of a voluntary termination of the lease, an involuntary termination for the taxpayer's default or the taxpayer's bankruptcy, the improvements "shall be retained by and belong to" the lessor or "shall thereupon become the property of the Lessor" or "the title to the building shall then vest in the Lessor."

¶ 16  Maricopa County determined that these provisions reflected an agreement that the parties treat ownership of the improvements as being in the Lessee.  It accordingly assessed the airport improvements as unsecured personal property owned by the taxpayer.  The taxpayer successfully challenged the assessment in superior court.  On appeal, this court concluded that provisions of the lease other than those on which the County relied contradicted its view of the lease. These provisions included the requirement that the lessee build the improvements, certain restrictions on the lessee's use of the improvements, the requirement that the lessee obtain the lessor's approval of the build-

---

2. The County has chosen not to challenge the court's ruling that a 1979 judgment precluded it from taking the position that AP owned the airport improvements that it occupied.  ACC was not a party in the litigation that yielded that judgment.

ing plans for the improvements the lessee was to build, the requirement that the lessee provide fire insurance on the improvements naming both lessee and lessor as insureds, the prohibition against the lessee's sublease of any portion of the premises without the lessor's written consent in advance, and a rent-calculation formula that based rental amounts on building occupancy.

¶ 17 This court then explained the three provisions under which the lessor "became" the improvements' owner or was "vested" with "title" on the occurrence of specified conditions as intended "to foreclose the possibility that any right of third persons could intervene to defeat lessors' paramount title...." 12 Ariz.App. at 554, 473 P.2d at 479.

> We hold because of the absence of clear and express language in this lease evidencing an intent to treat the improvements on the real property as personal property with ownership in the lessee, that the lease intended ownership of all the improvements in the lessor as real property during the term of the lease.

*Id.* at 555, 473 P.2d at 480.

¶ 18 In *Cutter Aviation*, we again considered the dispositive criteria for determining ownership of lessee-constructed improvements on land owned by a public body. Cutter Aviation and Southwest Air leased land from the City of Phoenix at Phoenix Sky Harbor International Airport. The question before us was whether, for tax year 1993, Cutter and Southwest "owned" the improvements they had built on airport land or whether they held only possessory interests in those improvements.[3] We held that the governing Arizona case law required the court "to interpret 'ownership' by focusing on the context in which the term is used and on the legislature's objective in enacting the subject legislation." 191 Ariz. at 491, 958 P.2d at 7.

The applicable context, of course, is the taxation of property interests and, more particularly, possessory interests. For taxation purposes, "ownership" has traditionally meant ownership in fee, which includes the rights of control and disposal. [Citations omitted].

The legislature's purpose in enacting the possessory interest taxation scheme was to extend property taxation to property interests that previously had not been taxed. Accordingly, its exclusion of ownership interests in the possessory interest definition, A.R.S. § 42–681(3), was intended to exclude property already subject to property taxation. In this context, ownership should be interpreted to mean the type of property interest that has traditionally been subject to taxation, i.e., fee interests with the authority to control and dispose of the property, rather than leasehold interests.

Improvements that a lessee has full authority to control or destroy need not be made subject to the possessory interest tax because they are already taxable. On the other hand, where the putative taxpayer leases property and the lease significantly restricts the lessee's authority to control and dispose of the improvements thereon, the lessee should not be considered to be the "owner" of the improvements.

Applying this standard, Southwest and Cutter were not the owners of the improvements. The leases mandated the improvements to be built and the uses to which they could be put, and required the city's approval of the building specifications. The leases also required that Southwest and Cutter maintain insurance on the improvements which designated the city as the named insured. Neither Southwest nor Cutter were allowed to transfer any interest in their leaseholds, which would include any interest in the improvements, without the city's prior written con-

---

**3.** The answer to this question was a subsidiary step in addressing the County's contention that, in view of the 1% assessment percentage for new class thirteen (IPR) property, the 1994 adoption of that classification retroactively to January 1, 1993, violated Arizona's constitutional prohibition against making gifts of public funds. ARIZ.

CONST. ART. 9, § 7 (the Gift Clause). Because the court determined that the taxpayers held only possessory interests in the improvements, it did not need to resolve the Gift Clause question. *See* 191 Ariz. at 490–493 and n. 3, 958 P.2d at 6–9 and n. 3.

sent. In addition, upon termination, the improvements were not subject to Southwest's or Cutter's removal or destruction but were to be the property of the city.[4]

Under the leases, then, Southwest and Cutter did not enjoy traditional rights of control and disposition of the improvements. We therefore conclude that they were not owners for purposes of A.R.S. section 42–681(3).

*Id.*

¶ 19 ACC's lease contains many of the features on which the court in *Novasic* determined that the taxpayer before it did not own the improvements on which the County sought to tax it. Further, again like the lease in *Novasic,* ACC's lease contains no "clear and express language . . . evidencing an intent to treat the improvements on the real property as personal property with ownership in the lessee." 12 Ariz.App. at 555, 473 P.2d at 480. Additionally, ACC's lease shares every characteristic that led this court in *Cutter Aviation* to conclude that the taxpayers did not own the improvements in question. The provisions in ACC's lease make it quite clear that, like the taxpayers in *Cutter Aviation,* ACC "did not enjoy traditional rights of control and disposition of the improvements." 191 Ariz. at 491, 958 P.2d at 7. ACC did not "own" the improvements it occupied during the tax years in question here.

¶ 20 The County's other citations and contentions do not dissuade us from adhering to *Cutter Aviation* and *Novasic.* It points out that the only property to which ACC's lease recitals refer as being "lease[d]" is the unimproved land, denominated as "the Demised Premises," on which ACC's improvements were later built. We do not read these references as manifesting agreement that ACC was to be considered the owner of the improvements. As the taxpayers point out, the lease was drafted before any improvements were built. In that context, ref-

erences to the "demised premises" as "land" were understandable. Moreover, contrary to the County's implicit contention, the term "demised premises" was not used consistently through the lease to refer to the leased ground only. For example, paragraph XXII provided that, in the event of expiration or termination of the lease, ACC was to "leave the Demised Premises in good condition except for normal wear and tear." Similarly, under paragraph XII, "rental for the Demised Premises" included not only "Ground Rental" at a fixed sum but also specified percentages of "gross receipts," defined as "all money . . . or other things of value . . . from the use or occupation of the Demised Premises." These uses of the term "Demised Premises" plainly encompassed both land and improvements.

¶ 21 The County additionally asserts:

. . . [Section XXII, entitled *SURRENDER OF POSSESSION* ] states that "Upon the expiration or other termination of this lease . . .", "Title to all Improvements *shall vest* in the Lessor." . . . This language clearly indicates an intent of the parties that ACC own the improvements during the term of the lease. The lease never refers to the improvements as belonging to the City until termination of the lease.

(Emphasis original.) We disagree. The complete text of paragraph XXII provides:

Upon the expiration or other termination of this lease, Lessee's right to use the premises, facilities, rights, licenses, services and privileges herein leased shall cease, and Lessee shall forthwith upon such expiration or termination, surrender the same and leave the Demised Premises in good condition except for normal wear and tear. Title to all Improvements shall vest in Lessor.

The full passage obviously does not employ the direct temporal linkage that the County's

---

4. Among the decisions on which the County relies are *Comm'r of Internal Revenue v. Hills,* 115 F.2d 322, 324 (10th Cir.1940) (ownership of improvements passed to lessor at end of lease term); *Roach v. Matanuska Valley Farmers Cooperating Ass'n,* 87 F.Supp. 641 (D.Alaska 1949), *aff'd,* 188 F.2d 162 (9th Cir.1951)(same); *In re*

*Blue Knob Recreation, Inc.,* 122 Pa.Cmwlth. 156, 551 A.2d 9 (1988)(same); *Venango Federal Savings and Loan v. County of Venango,* 73 Pa. Cmwlth. 313, 457 A.2d 1340 (1983)(same). The analysis in *Cutter Aviation* renders these decisions unpersuasive and inapposite.

truncated quotation implies. Moreover, the County does not dispute the correctness of the following assertions of the taxpayers:

The parties used the 1977 Scottsdale lease form [between AP and the city] in preparing the 1982 lease [assigned to ACC]. Mindful, however, that the County argued in *Novasic* and in the 1977 tax appeal that the *Novasic* and the 1977 leases were unclear as to the vesting of title to the improvements, **the parties amended the Surrender and Termination provisions when preparing the 1982 lease to make clear that title to the improvements vested in Scottsdale.** Specifically, they deleted the language that "(T)itle to all construction and installation of Lessee shall pass to the lessor as provided herein" in the Surrender provision, and substituted the unequivocal **"Title to all improvements shall vest in Lessor."** They also deleted in its entirety the language "all such improvements shall become the property of Lessor" upon termination in the Termination provision.

(Emphasis original.)

¶ 22 The County also contends that a "property interest may be classified under [former] § 42–162(A)(12)(c) [possessory interests in publicly-owned airport property] only if that interest is created pursuant to A.R.S. §§ 2–311, 2–312, or 2–313 (repealed by Laws, 1995, ch.132, § 1, eff. 1–1–97). These statutes, which consistently speak in terms of 'land' being leased at an airport, make clear that only the land is being leased." The major premise of this contention is a fundamental misreading of former A.R.S. section 42–162(A)(12)(c), which included within class twelve:

Interests in **property located on state, city, town or county airports and public airports operating pursuant to sections 2–311, 2–312 and 2–313,** if the property is used for or in connection with aviation, including hangars, tie-downs, aircraft maintenance, sales of aviation-related items, charter and rental activities, parking facilities and restaurants, stores and other services located in a terminal.

(Emphasis added.)

■ ¶ 23 The County interprets former A.R.S. section 42–162(A)(12)(c) as if the par-

ticipial phrase "operating pursuant to sections 2–311, 2–312 and 2–313" modified "state, city, town or county airports" as well as "public airports." However, former A.R.S. sections 2–311, 2–312 and 2–313 exclusively concerned leases of state, city, town or county land to nonprofit corporations for airport or air terminal purposes. Any "public airport" "operating pursuant to sections 2–311, 2–312 and 2–313" is necessarily a "state, city, town or county airport" because all such public airports are operated on land owned by the state or a city, town or county. The County's interpretation of former A.R.S. section 42–162(A)(12)(c) would therefore render the words "state, city, town or county airports" entirely superfluous. We presume that the legislature does not intend to draft statutory provisions that are redundant, void, inert, trivial, superfluous or contradictory. *See Vega v. Morris,* 184 Ariz. 461, 910 P.2d 6 (1996). We thus conclude that the County's interpretation and its argument are wrong.

■ ¶ 24 The County also relies on paragraph XXXIII of the lease. Under that provision, if the City of Scottsdale were to cancel the lease under its power of eminent domain, it would be required to compensate ACC pursuant to a formula based on the fair market value of the improvements. This, however, does not place ownership of the improvements in ACC. Paragraph XXXIII provides:

If this Lease is canceled under the provisions of this clause, Lessor will be obligated to pay to Lessee the then fair market value, or the original construction cost less depreciation at the rate of four (4) percent per year from the date of completion, whichever is greater, of the Improvements.

Given the unequivocal provision in paragraph XXII that "Title to all Improvements shall vest in Lessor" and the congruence of other provisions of the lease with those in *Cutter Aviation,* the more reasonable interpretation of this provision is that it was intended to provide the lessee with a measure of compensation for the loss of its leasehold interest in

the improvements that the lease's termination would cause.

¶ 25   Finally, the County relies on the decision in *In re Forsstrom*, 44 Ariz. 472, 38 P.2d 878 (1934),[5] for the proposition that the right to use and control "property" constitutes all that is beneficial in "ownership," and that the right to dispose of property therefore need not be present for "ownership" to obtain. *In re Forsstrom* is inapposite. That was an eminent domain case. The issue was whether governmental action that would merely damage access to or diminish the value of private property constituted a "taking" of property authorized by the statutes of the time. The gist of the court's decision was that the right to use and control property constituted "property" that could be "taken" by the power of eminent domain. The opinion neither stated nor implied that a person can "own" property even though he has no right to alienate or dispose of it.

¶ 26   The County also resorts to multiple decisions from other jurisdictions to support this theme, for example, *Mitchell Aero, Inc. v. City of Milwaukee*, 42 Wis.2d 656, 168 N.W.2d 183 (Wis.1969)(lessee that had constructed improvements on airport property had sufficient ownership interest to sustain taxation, though lessor held legal title to improvements and controlled lessee's use of them); *Bowen v. Metropolitan Bd. of Zoning Appeals*, 161 Ind.App. 522, 317 N.E.2d 193 (1974) ("owner" need not be interpreted as fee owner unless required by statute). These decisions conflict with the *Novasic–Cutter Aviation* analysis.

¶ 27   The superior court correctly determined that ACC did not "own" the improvements it occupied at the Scottsdale Municipal Airport.

### B.   County's Standing to Challenge Constitutionality of Statutes

■ ¶ 28   The analysis of the Arizona Department of Revenue ("DOR") advances the proposition that the County lacks "standing" to challenge the constitutionality of any Arizona statute. It generally argues that a county is a subdivision of the state and cannot challenge the actions of its parent, citing

*Town of Wickenburg v. State*, 115 Ariz. 465, 565 P.2d 1326 (App.1977), for the proposition that a creation of the state has only those powers expressly granted to it. However, its specific contention is only that "the County lacks standing to challenge the Arizona Legislature's repeal of the possessory interest tax statutes, 1995 Laws, ch. 294. The County's request that the legislation be found unconstitutional must therefore be denied."

¶ 29   The County responds that it is not challenging the constitutionality of the repeal of the possessory interest tax but, rather, that it "is simply seeking a constitutional application of the repeal and assumes that the legislature, in enacting the repeal, did not intend an unconstitutional result." It also contends that it would in any event have authority pursuant to A.R.S. section 11–202 and standing through the Uniform Declaratory Judgments Act, A.R.S. sections 12–1831 through 12–1846, to challenge the repeal's constitutionality.

¶ 30   We disagree with the County to the extent that it is contending that its legal position does not challenge the constitutionality of any Arizona statute. It is true that its analysis of the repeal of the possessory interest tax can be read not to attack its constitutionality but merely to argue for a constitutional application of the Arizona taxing statutes that survived it. At the same time, the County quite clearly contends that Arizona's former possessory interest taxing scheme and its current IPR taxing scheme violate the Uniformity Clause.

¶ 31   We have faced the same "standing" question twice before in *Cutter Aviation*, 191 Ariz. 485, 958 P.2d 1, and *Maricopa County v. State (Sherwood)*, 187 Ariz. 275, 928 P.2d 699 (App.1996). In *Cutter Aviation*, we ruled as follows:

Assuming *arguendo* that the county does lack standing to challenge these statutes, we nevertheless exercise our discretion to consider the county's arguments. We are influenced by the experience of another panel of this court in *Maricopa County v. State (Sherwood)*, 187 Ariz. 275, 928 P.2d 699 (Ariz.App.1996). In that case DOR and individual intervenor appellants cited

---

**5.** Overruled, *Mohave County v. Chamberlin*, 78 Ariz. 422, 281 P.2d 128 (1955); *State ex rel.*

*Morrison v. Thelberg*, 87 Ariz. 318, 350 P.2d 988 (1960).

*Town of Wickenburg* and earnestly advanced the proposition that Maricopa County lacked standing to challenge the constitutional validity of a state statute. At oral argument, however, the appellants stated that they no longer challenged the county's standing and requested that the court address the county's arguments. Noting that standing was not a constitutional mandate in Arizona, *see In re Strobel,* 149 Ariz. 213, 216, 717 P.2d 892, 895 (1986), the court accepted the appellants' abandonment of the standing issue and addressed the merits of the appeal. ...

Although Southwest, Cutter, and DOR have not abandoned the standing issue, we find the reasons expressed in *Sherwood* for addressing the county's challenges to a state statute to be equally valid in the instant case. Addressing the county's arguments here will conserve judicial resources and prevent the additional litigation expense necessary to substitute individual taxpayers into the present litigation. *See id.* Accordingly, we elect to address the constitutional issues that the county has properly preserved and are necessary to resolve these appeals.

191 Ariz. at 494, 958 P.2d at 10. We take the same approach in the instant consolidated appeals.

C. *No–Exemption Clause versus Repeal of Possessory Interest Taxing Statutes; Taxation of Possessory Interests Under Existing Statutes Apart from Former A.R.S. Sections 42–681 through 42–687*

¶ 32    The County contends that the superior court's judgment violated the No–Exemption Clause.[6]    It urges that, in accord with this clause of the constitution, any category or item of property in Arizona that is not expressly exempted under the laws of the United States, the Arizona Constitution or a statute authorized by the Arizona Constitution is strongly presumed to be "taxable," and it includes possessory interests within that category.

¶ 33    The County also contends that the superior court's judgment violated the No–Exemption Clause by holding that, "despite the prohibition against exemptions, the legislature has the power to choose not to tax certain types of property." The County reasons:

> ... It is the Constitution, not the legislature, that declares which property is subject to taxation. The Constitution does not include possessory interests as a type of property interest eligible for property tax exemptions. Because the legislature cannot exempt possessory interests from taxation, the legislature's failure to enact provisions for their taxation cannot render possessory interests untaxable. "It [the legislature] cannot do indirectly what it cannot do directly." *[State v.] Yuma Irrigation Dist.,* 55 Ariz. [178] at 184[, 99 P.2d 704 (1940) ].

\* \* \*

> ... The proper interpretation of the result of the repeal of the possessory interest

6.    The pertinent provisions are:
  Section 2.    (1) There shall be exempt from taxation all federal, state, county and municipal property.
  (2) Property of educational, charitable and religious associations or institutions not used or held for profit may be exempt from taxation by law.
  (3) Public debts, as evidenced by the bonds of Arizona, its counties, municipalities or other subdivisions, shall also be exempt from taxation.
  (4) All household goods owned by the user thereof and used solely for noncommercial purposes shall be exempt from taxation, and such person entitled to such exemption shall not be required to take any affirmative action to receive the benefit of such exemption.

[ (5) – (10) — inventory, agricultural personalty, World War I, World War II, other veteran, and widow exemptions]
  (11) No property shall be exempt which has been conveyed to evade taxation. The total exemption from taxation granted to the property owned by a person who qualifies for any exemption in accordance with the terms of subsections (7), (8), (9) or (10) shall not exceed one thousand five hundred dollars. The provisions of this section shall be self-executing.
  (12) All property in the state not· exempt under the laws of the United States or under this constitution or exempt by law under the provisions of this section shall be subject to taxation to be ascertained as provided by law.

tax statute is that for the 1995 tax year, Appellees' interests in the subject improvements remain fully taxable under the remaining provisions of Title 42 and are properly classified as Class 3 commercial property subject to a 25% assessment ratio. A.R.S. §§ 41–162(A)(3)[sic] and 42–227(A)(3).

¶ 34   Despite the County's citation to valid legal authority in support of its analysis, its two critical premises are *ad hoc* postulations with no legal support. Simply summarized, they are:

(1) Within ARIZ. CONST. Art. 9, sec. 2(12), the provision "[a]ll property [not expressly exempted] . . . shall be subject to taxation to be ascertained as provided by law" means the same as "The legislature shall enact legislation by which all property not expressly exempted . . . shall be taxed," and, as a corollary,

(2) By choosing not to provide for the taxation of a particular category of property that is not expressly exempt, the legislature necessarily accords a tax exemption that ARIZ. CONST. Art. 9, sec. 2 does not authorize.

■■■   ¶ 35   For constitutional provisions as well as statutes, the best indicator of the drafters' intent is the provision's language. *See, e.g., Fain Land & Cattle Co. v. Hassell,* 163 Ariz. 587, 790 P.2d 242 (1990). Undefined words in a constitutional provision are to be interpreted as generally understood and used by the people, according to their natural, obvious and ordinary meaning. *McElhaney Cattle Co. v. Smith,* 132 Ariz. 286, 645 P.2d 801 (1982); *Apache County v. Southwest Lumber Mills, Inc.,* 92 Ariz. 323, 376 P.2d 854 (1962). A court may go outside the plain language of a constitutional provision when the provision's intent is unclear, and, in that event, it will look to its context, effect, consequences and the spirit of the law. *State v. Superior Court in and for County of*

*Maricopa,* 186 Ariz. 363, 922 P.2d 927 (App. 1996).

■■   ¶ 36   The ordinary, natural and generally-understood meaning of the words "[a]ll property [not expressly exempted] . . . shall be subject to taxation to be ascertained as provided by law" is not at all equivalent to that of "The legislature shall enact legislation by which all property not expressly exempted . . . shall be taxed." Arizona courts have frequently resorted to recognized, authoritative dictionaries of the English language on questions of the ordinary meanings of words contained in statutory provisions. *See, e.g., City of Avondale v. Deere Credit, Inc.,* 191 Ariz. 307, 955 P.2d 544 (App.1998); *State ex rel. Arizona Dep't of Revenue v. Short,* 192 Ariz. 322, 965 P.2d 56 (App.1998); *Mulleneaux v. State,* 190 Ariz. 535, 950 P.2d 1156 (App.1997). WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (G. & C. Merriam & Co.1971) defines the word "subject" as used in "subject to" in pertinent part as follows:

. . . **2 a :** suffering a particular liability or exposure < ~ to very severe draughts> < ~ to temptation> . . . **4 :** likely to be conditioned, affected, or modified in some indicated way : having a contingent relation to something and usu. dependent on such relation for final form, validity, or significance <democratic representatives whose acts are ~ to discussion and criticism—M.R. Cohen> <a treaty ~ to ratification>"

¶ 37   These definitions confirm that the idea that something is "subject to" an influence or action does not communicate the idea that it is continuously and actively affected by that influence or action. The meaning conveyed is, rather, that its situation is necessarily such that it may become so. *See Fry v. Mayor and City Council of Sierra Vista,* 11 Ariz.App. 490, 495, 466 P.2d 41 (1970) ("[T]he term 'subject to taxation' merely means liable to taxation rather than that the property must be subjected to taxation.").[7]

---

7. The court in *Linville v. Cheney,* 60 Ariz. 325, 331, 137 P.2d 395 (1943), *overruled on other grounds, State v. Miami Trust Co.,* 61 Ariz. 499, 152 P.2d 131 (1944), condemns "indirect" exemptions not authorized by ARIZ. CONST. Art. 9, § 2(12), but it is of no help to the County. That case concerned taxes that had already been lev-

ied and become a lien on taxable real property. The issue before the court was whether that lien survived a sale of the property for taxes that later accrued and became delinquent. The court neither held nor implied that the legislature was constitutionally required to tax all property not

¶ 38 The drafters of several provisions that were added to Article 9 of the Arizona Constitution after its adoption plainly understood this difference. The portion of Article 9, section 11, added by popular vote in 1972, provides in part:

> From and after December 31, 1973, a **license tax is hereby imposed on vehicles registered for operation** upon the highways in Arizona, which license tax shall be in lieu of all ad valorem property taxes on any vehicle subject to such license tax. Such license tax shall be collected as provided by law. . . .
>
> * * *
>
> From and after December 31, 1973, mobile homes, as defined by law for tax purposes, **shall not be subject to the license tax** imposed under the provisions of this section but **shall be subject to ad valorem property taxes on any mobile homes in the manner provided by law.**

(Emphasis added.) By wording the first of these provisions to impose the tax directly and leaving the details to legislation, the drafters made it unmistakably clear that the legislature was required to tax all registered vehicles. Article 9, section 15, added by popular vote in 1964, uses the same device for aircraft registered to operate in Arizona.

¶ 39 In sharp contrast, the second provision uses "subject to" in the same way as Article 9, section 2(12), with which this case is concerned. That provision removes mobile homes from the scope of the license tax but does not directly impose ad valorem property taxes on them. Instead, it lumps mobile homes together with all other property to which section 2(12) applies, mandating only that they be "subject to" ad valorem property taxation "in the manner provided by law."

¶ 40 The difference between "shall be subject to taxation" and "shall be taxed" was equally plainly understood by the original drafters of the Arizona Constitution. The original version of the Constitutional Convention's Proposition 106 provided, "[a]ll property in the State, not exempt under the laws of the United States, or under this Constitution, **shall be taxed in proportion to its value,** to be ascertained as provided by law." John S. Goff, ed., Records of the Arizona Constitutional Convention of 1910, at 1260 (emphasis added). On November 19, 1910, the Committee on Public Debt, Revenue and Taxation offered Substitute Proposition 106[8] in its stead. The Committee of the Whole approved it the same day. *Id.* at 464, 489. Among other changes, Substitute Proposition 106 replaced the original Proposition's language with this:

> All property in the state not exempt under the laws of the United States or under this Constitution **shall be subject to taxation to be ascertained as provided by law.**

*Id.* at 1263 (emphasis added). On December 3, 1910, the Committee on Style, Revision and Compilation offered an engrossed copy of Substitute Proposition 106. The Committee of the Whole accepted it. *Id.* at 849, 864. After considerable debate on December 6, 1910, the Committee of the Whole then approved a version amended to provide:

> All property in the state not exempt under the laws of the United States or under this Constitution, or exempted by law under the provisions of this section, shall be subject to taxation to be ascertained as provided by law.

*Id.* at 930–43. This became the concluding sentence of Article 9, section 2 of the 1910 Constitution, and it has carried forward to the present day without change other than numbering and punctuation. Ariz. Const. Art. 9, § 2(12). Unlike the original Proposition 106, this provision contains no language requiring the taxation of all property in Arizona not expressly exempted. As we have

---

expressly exempted by or under federal law or the Arizona Constitution.

**8.** Goff explains:

> Delegates were free to introduce "propositions," which were materials they wished placed in the constitution. In all 153 of these propositions were introduced. . . . After being printed each proposition was sent to an appropriate committee. . . . Committees then made recommendations about the propositions to the convention which much of the time sat as a committee of the whole. . . . Rather often substitute propositions were produced. . . .
>
> *Id.* at iv.

held, this provision instead leaves to the legislature's discretion whether particular categories of property are to be taxed.

¶ 41   The County's contention that the legislature's repeal of the possessory interest taxing scheme created an unconstitutional "exemption" is similarly erroneous. WEBSTER'S defines "exempt" in pertinent part as:

> 3 : free or released from some liability to which others are subject : excepted from the operation of some law or obligation : not subject to : not liable to—used with *from* <goods ~ from execution> < ~ from jury service> <tax-*exempt* >"

And Article 9, section 2 of the Arizona Constitution itself provides the best examples of tax "exemptions" in the constitutional sense. Section 2(2) expressly permits the legislature to exempt "[p]roperty of educational, charitable, and religious associations or institutions not used or held for profit." Section 2(4) exempts all household goods used by their owner for noncommercial purposes. Section 2(9) exempts up to $1500 in assessed value of property of honorably-discharged veterans who have lived in Arizona since before September 1, 1945, and have been certified as having non-service-connected total and permanent disabilities. Sections 2(10), 2.1, and 2.2 provide similar exemptions for widows, widowers and persons medically certified as totally and permanently disabled after age 17.

¶ 42   These provisions all cut across diverse categories of otherwise-taxable property and insulate portions of each from taxation based on fundamentally legislative considerations that may or may not be related to the defining criteria of the categories affected. For instance, Article 9, section 2(4) exempts every kind of tangible personal property as long as it is used by its owner for noncommercial, household purposes. Section 2(9) exempts for certain qualified veterans every kind of property, real or personal, tangible or intangible, to a maximum of $1500 in assessed value. For tax purposes, then, an "exemption" implies a discrete exception to the general rule of taxation, carved out of a category or categories that would otherwise be subject to uniform taxation.

¶ 43   Viewed in that way, a legislative decision not to provide for ad valorem taxation of possessory interests does not "exempt" them from taxation at all. Possessory interests are a discrete category of property in and of themselves. The legislative decision does not "exempt" them; it omits them from the state's exercise of its power to tax by dint of sovereign political discretion.

¶ 44   This distinction is admittedly not a precise one. It must nevertheless be drawn. The County's competing view is that the legislature has a positive duty to tax all non-constitutionally-exempt property of whatever nature and that it is wholly impotent to refrain from imposing ad valorem taxation on any particular category of property unless the Constitution requires or empowers it to do so. This approach wholly ignores the Constitutional Convention's deliberate choice to supplant the original language of Proposition 106, "**shall be taxed** according to its value …," with the current language, "**shall be subject to taxation** …."

¶ 45   The County's approach is also inconsistent with the vesting of the "legislative power of the state" in the legislature under ARIZ. CONST. Art. 4, Part 1, sec. 1(1). It fails to recognize and preserve the broad and deep reservoir of discretionary governmental authority entrusted to the legislature by the people as their direct representatives.

¶ 46   The County nevertheless urges that the burden is on the party arguing that a given item of property is not "taxable" to demonstrate that the Arizona statutes omit adequate mechanisms for assessing taxes against such property. It criticizes the superior court's "faulty reliance on outdated cases which do not consider the constitutional implications of tax exemptions," citing *Maricopa County v. Fox Riverside Theatre Corp.*, 57 Ariz. 407, 114 P.2d 245 (1941), and *Navajo County v. Monument Valley Inn*, 13 Ariz. App. 525, 478 P.2d 140 (1971). The County also finds the reliance of the court in *Fox Riverside* on its earlier decision in *Maricopa County v. Trustees of Arizona Lodge No. 2, F. & A. M.*, 52 Ariz. 329, 80 P.2d 955 (1938), "misplaced" and contends that both decisions have long since been superseded by substan-

tial changes in the taxing statutes over the years. Specifically, the County contends that Arizona statutes apart from the repealed possessory interest taxing provisions were fully adequate to permit classification, assessment, valuation and equalization of taxes of possessory interests. We disagree. The pertinent case law is contrary to the County's position.

¶ 47 We consider initially the County's assertion that possessory interests were taxed in Arizona from Territorial days until *Fox Riverside*. The cases on which it relies for this proposition support it, but they also demonstrate why it is of no help to the County in this case. In *State ex rel. Burgoon v. Watts*, 21 Ariz. 93, 185 P. 934 (1919), the property in question was a claim not to possession of land, but, rather, to title. The taxpayers were successors in interest of persons who had inherited a right to select for ownership a tract of defined size at a location of their choice within a larger tract that Mexico had ceded to the United States in 1848 in accord with the Treaty of Guadalupe–Hidalgo. The taxpayers' contention was that their claim of ownership had not yet been sufficiently defined by survey to "become segregated from the public domain so as to render them susceptible of taxation by the state of Arizona and county of Santa Cruz." *Id.* at 99, 185 P. at 936. The question whether the legislature had intended to exercise its power to tax claims to government land in general was not before the court.

> We think that the state had the power to tax the defendants' "claim to" the land for the years 1913 and 1914, without laying any tax upon the property of the government, in violation of the Enabling Act prohibiting the imposition of taxes upon government property.

*Id.* at 102, 185 P. at 936.

¶ 48 In *Earhart v. Powers*, 17 Ariz. 55, 148 P. 286 (1915), the property at issue was a mining claim. The court held: "The state had power ... to tax the 'mining claims' in question, and if it had been necessary to enforce the collection of the tax by a sale of the property, such a sale would have conveyed merely the right of possession, and affected no interest of the United States."

*Id.* at 60, 148 P. 286. Implicit in the court's holding is that the question whether to impose taxation on mining claims, which it plainly had chosen to do, was within the legislature's discretion.

¶ 49 In *Delinquent Tax List of the County of Pima for the Year 1891 v. Territory of Arizona*, 4 Ariz. 186, 37 P. 370 (1894), the taxpayers' contention was that taxes levied on their "unconfirmed Mexican land grants" were invalid as taxes on land owned by the United States Government. The court held "[A]n assessment of taxes to individuals, as follows: 'Land and improvements. San Ignacio La Canoa, private land claim,'—may be construed as an assessment upon the equitable claim or 'possessory claim' thereto, and not as an assessment upon the fee or land itself." *Id.* at 188, 37 P. at 370. The Territorial Supreme Court was not asked to decide whether such a tax was valid or intended by the legislative body.

¶ 50 Finally, *Atlantic & Pacific Railroad Co. v. Lesueur*, 2 Ariz. 428, 19 P. 157 (1888), concerned the railroad's franchise and the improvements, culverts, bridges, ties, iron and buildings it built on land within a right-of-way granted by the United States. Interpreting federal law, the court held that the statutory exemption of the right-of-way from taxation did not extend to appurtenances later placed on it. It also held that the territorial legislature had power to tax the franchise: "A franchise is property, has value, and it is not prohibited to tax it." *Id.* at 434, 19 P. at 160. No question was presented concerning whether the legislature had intended to authorize taxation of franchises or possessory rights in government land.

¶ 51 We turn to the County's criticism of the Arizona decisions that stand opposed to its position in this case. In *Trustees of Arizona Lodge*, 52 Ariz. 329, 80 P.2d 955, Maricopa County assessed ad valorem property taxes on conditional sales contracts, chattel mortgages and real estate mortgages. The court affirmed a judgment for the taxpayers. It said that, as to other varieties of intangibles, "the legislature has specifically designated intangibles that are to be assessed and others that are not." *Id.* at 337, 80 P.2d at 958. Among others, the court noted that

shares of banking and finance corporations were assessable to their shareholders, while express companies and private car lines were taxed on their income only.

¶ 52 As to mortgages and conditional sales contracts, the court pointed out that, though the statutes had designated all tangible and intangible personal property as "subject to taxation," the legislature had "failed to provide a method of equalizing intangibles and also an adequate method of procedure to collect the tax on intangibles when the owner is not possessed of realty sufficient in the judgment of the assessor to pay both taxes." *Id.* Given what the court perceived as the reliance of Arizona domiciliaries on administrative forbearance to assess taxes on such intangibles for the previous fifty years, it decided that "it is better that the legislature change it than that we disturb vested rights by sustaining defendants' position.... " *Id.* at 343, 80 P.2d at 960.[9]

¶ 53 The court followed *Trustees of Arizona Lodge* in *Fox Riverside*, 57 Ariz. 407, 114 P.2d 245. There, the County assessed property taxes against a leasehold the taxpayer held in real property owned by the City of Phoenix. On the County's appeal from a judgment for the taxpayer, the court held that a leasehold in government-owned real property could be taxed separately from the fee without violating the Arizona constitutional provision exempting governmental property from taxation. It continued:

> The second question is whether that power has been exercised, for there are many classes of taxation which the state may provide for but does not. Do our statutes show that the state has attempted to subject leasehold interests in public property to taxation? After a careful examination of these statutes from early territorial days to the present time, we can find therein no specific reference to the taxation of leasehold interests of this nature, nor, so far as we have been able to ascertain, have the taxing authorities ever attempted to exercise this power.

\* \* \*

> ... [W]e hold ... that since the legislature has not expressly provided that leaseholds of this nature should be taxed, and has set up no machinery by which such a taxation could be carried into effect, question (b) should be answered in the negative.

*Id.* at 412, 414, 114 P.2d at 247, 248.

¶ 54 It is certainly true, as the County maintains, that Arizona's ad valorem property taxing statutes have been amended and supplemented numerous times since *Fox Riverside* was decided. We are also confident that, as the County contends, the present statutory machinery is fully adequate for valuing, assessing, equalizing and collecting taxes imposed on possessory interests in governmental real property. In our opinion, however, the County's emphasis on this point altogether misses the underlying holding of *Fox Riverside*.

¶ 55 The court in *Fox Riverside* made explicit what was merely implicit in the court's earlier decision in *Trustees of Arizona Lodge*. The legislature's omission of equalization and collection procedures for taxation of leaseholds was not itself the reason for the *Fox Riverside* holding that such intangibles were not then taxed. That omission was instead the evidence on which the court founded its true holding—that the legislature had intended to refrain altogether from taxing that category of property.

¶ 56 We do not agree with the County that the court in *Fox Riverside* incorrectly failed to consider the No–Exemption Clause. In asking, "Do our statutes show that the state has attempted to subject leasehold interests in public property to taxation?", the court displayed an understanding necessary to its holding that, whether property which is "subject to taxation" under the No–Exemption Clause will actually be taxed is a question committed to the legislature.

9. The County distinguishes *Trustees of Arizona Lodge* on the basis that mortgages are deemed merged with the fee and that it would violate the principle against double taxation to tax both mortgages and the underlying fee. Our reading of the case discloses no mention of that rationale at all.

¶ 57    As we have already suggested, the relevant inquiry in this case is not whether the general personal property tax statutes remaining after the legislature's repeal of A.R.S. sections 42–681 through 42–687 still provide adequate machinery for valuing, equalizing and collecting property taxes on possessory interests.    It is instead whether the legislature intended to continue to impose ad valorem property taxes on possessory interests despite the repeal.    The answer is clearly that it did not.    Nothing in Arizona's ad valorem property taxation scheme suggests any legislative contemplation that possessory interests be taxed, under the existing mechanism or otherwise.    Indeed, the legislature has so stated quite directly.    Section 1 of 1995 ARIZ. SESS. LAWS Ch. 294 states in part:

> A.    Notwithstanding any · other provisions of law, it is the intent of the legislature that by repealing sections 42–681 through 42–685 and section 42–687, Arizona Revised Statutes, and amending sections 42–162 and 42–227, Arizona Revised Statutes, that possessory interest will not be subject to any type of ad valorem tax until the legislature enacts a new taxing mechanism.

> B.    It is the intent of the legislature that the study committee created by this act will study the taxation of possessory interests and make recommendations concerning the taxation of all possessory interest that will be considered retroactively, beginning with the 1995 tax year.

¶ 58    We finally offer a brief comment on the County's universal-mandatory-property-taxation thesis as measured by the yardstick of common sense.    The succinct response is found in the following cogent observation by the court in *Fox Riverside:* "[T]here are many classes of taxation which the state may provide for but does not."    57 Ariz. at 412, 114 P.2d at 247.    The natural result of the County's contrary position would be the re-

quired ad valorem taxation of such as the following:

- Cash, checking account balances and savings account balances;
- Limited partnership interests, mutual fund shares and accounts, shares of common stock in non-banking corporations and debt interests in non-governmental business entities;
- Contingent remainder interests in real property;
- Business accounts receivable and personal debts receivable;
- Non-business-use horses and other livestock;
- Patents, trademarks and copyrights;
- Off-road motorcycles and vehicles not required to be registered.

¶ 59    We do not presume to say that the legislature would act beyond common sense if it determined that one or more of these items of currently untaxed property should be assessed ad valorem property taxes.    We only question the common sense of a position that would have us hold that the legislature has no choice other than to impose such taxes on every variety of property listed and all others of which one might conceive.

¶ 60    The superior court did not err in rejecting the County's challenge under the No–Exemption clause.

### D.    Uniformity Clause versus Assessment of Possessory Interests and IPRs at 1% of Full Cash Value

¶ 61    The County also contends that the assessment and taxation of possessory interests and IPRs at 1% of full cash value for 1993 and 1994 violated the Uniformity Clause: "All taxes shall be uniform upon the same class of property within the territorial limits of the authority levying the tax. . . ."    We rejected this contention as applied to possessory interests in *Cutter Aviation,* 191 Ariz. at 494–497, 958 P.2d at 10–13.[10]    Fur-

10. In *Cutter Aviation,* the County brought Uniformity Clause challenges against both A.R.S. section 42–162(A)(12)(1993), concerning possessory interests, and A.R.S. section 42–162(A)(13) (1994), concerning IPRs.    We determined that the interests of both taxpayers constituted posses-

sory interests.    Accordingly, although we noted that the County had challenged the constitutionality of A.R.S. sections 42–162(A)(12) and (13), we resolved the County's Uniformity Clause contentions as they applied to possessory interests only.    191 Ariz. at 494–497, 958 P.2d at 10–13.

ther, because we have held that AP's and ACC's interests in the improvements they occupied at the Scottsdale Municipal Airport were possessory interests and not IPRs, we do not reach the County's constitutional attack on the IPR taxing scheme.

*E. Attorneys' Fees on Appeal*

¶ 62 AP and ACC each request an award of attorney's fees pursuant to A.R.S. section 12–348. In the exercise of our discretion, A.R.S. § 12–348(B)(Supp.1997), we grant each request subject to the limitation imposed by section 12–348(E)(5) on each award. AP and ACC may each prove the amounts of their awards by complying with ARIZ. R. CIV.APP. P. 21(C).

¶ 63 The judgment is affirmed.

CONCURRING: EDWARD C. VOSS, Presiding Judge, and CECIL B. PATTERSON, Jr., Judge.